Vilia B. Hayes (4/13/05)
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
(212) 837-6000

Attorneys for Defendant Merck & Co., Inc.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - x

PETER BOIANO and SYLVIA BOIANO,                   :
Individually and as Husband and Wife, ROBERT      :
H. COENE and BEVERLY COENE, Individually          :
and as Husband and Wife, MUHAMED                  :
KULIJOF, Individually, FELIX V. LaPINE,           :
Individually,                                     :
                                                  :
                              Plaintiffs,         :
                                                  :
                 -vs-                             :
                                                  :
MERCK & CO., INC., WILLIAM G. BOWEN,              :    No.: _____
PH.D., WILLIAM N. KELLEY, M.D.,                   :
LAWRENCE A. BOSSIDY, SAMUEL O.                    :
THIER, M.D., JOHNETTA B. COLE, PH.D.,             :    **NOTICE OF REMOVAL OF**
RAYMOND V. GILMARTIN, M.B.A.,                     :    **DEFENDANT MERCK & CO.,**
WILLIAM B. HARRISON, JR., ANNE M.                 :    **INC.**
TATLOCK, M.A., HEIDI G. MILLER, PH.D.,            :
THOMAS E. SHENK, PH.D., WILLIAM M.                :
DALEY, J.D., PETER C. WENDELL, M.B.A.,            :
WENDELL P. WEEKS, M.B.A., SHELLY                  :
LAZARUS, EDWARD M. SCOLNICK, H.                   :
BREWSTER ATWATER, JR., DENNIS                     :
WEATHERSTONE, CHARLES E. EXLEY, JR.,              :
LLOYD C. ELAM, ERSKINE B. BOWLES,                 :
ROSEMARY SOLURI, GIA ORLANDO, and                 :
DOES 1-100 ,                                      :
                                                  :
                              Defendants.         :

- - - - - - - - - - - - - - - - - - - - - - - x

PLEASE TAKE NOTICE that Merck & Co., Inc. ("Merck") hereby removes this action pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 from the Supreme Court of the State of New York, County of Monroe to the United States District Court for the Western District of New York and respectfully states to this Court the following:

1.      This action involves allegations regarding the prescription drug Vioxx®.  On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL Panel") issued an order transferring 148 Vioxx products liability cases to the United States District Court for the Eastern District of Louisiana (Fallon, J.) for coordinated pretrial proceedings under 28 U.S.C.§ 1407. Merck intends to seek the transfer of this action to that MDL proceeding, *In re VIOXX Products Liability Litigation,* MDL No. 1657, and will shortly provide to the MDL Panel notice of this action pursuant to the "tag-along" procedure contained in the MDL Rules.

2.      Plaintiffs Peter Boiano, Sylvia Boiano, Robert H. Coene, Beverly Coene, Muhamed Kulijof, and Felix V. LaPine ("Plaintiffs") filed this civil action against Merck in the Supreme Court of the State of New York, County of Monroe, bearing Index Number 11962/05. Plaintiffs seek damages for unspecified "tortious harm" and bodily injuries allegedly resulting from the ingestion of Vioxx.  (Compl. ¶ 32.)  Plaintiffs' claims are based on theories of negligence, strict liability, fraud, breach of warranty, statutory violations, and derivative claims.

3.      As more fully set out below, this case is properly removed to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 because Merck has (1) satisfied the procedural requirements for removal and (2) this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

## I.    MERCK HAS SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL.

4.      Merck has not yet been served with a copy of Plaintiffs' Summons and Complaint. A copy of Plaintiffs' Summons and Complaint was delivered to Rosemary Soluri's residence and Gia Orlando's former residence on October 27, 2005. Service by mail followed and affidavits of service were filed on October 31, 2005. Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b). A true and correct copy of the Summons and Complaint is attached hereto as Exhibit 1.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 112(d) because it is the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

6.      Defendants who have not been served and/or who are fraudulently joined need not consent to removal.[1] Only defendants Rosemary Soluri and Gia Orlando have been served. All defendants, other than Merck, are fraudulently joined.

7.      No previous application has been made for the relief requested herein.

8.      Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiffs and a copy is being filed with the Clerk of the Court for the Supreme Court of the State of New York, Monroe County.

---

1.      28 U.S.C. § 1441(b) does not bar removal. It is well-settled that co-defendants who are fraudulently joined and/or have not been served need not join in the removal. *See Jernigan v. Ashland Oil Inc.* 989 F.2d 812, 815 (5th Cir. 1993); *Durove v. Fabian Transp. Inc.*, No. 04 Civ. 7000 (RJH), 2004 U.S. Dist. LEXIS 25258, *3 n. 5 (S.D.N.Y. Dec. 14, 2004). William G. Bowen, Ph.D., William N. Kelley, M.D., Lawrence A. Bossidy, Samuel O. Thier, M.D., Johnetta B. Cole, Ph.D., Raymond V. Gilmartin, M.B.A., William B. Harrison, Jr., Anne M. Tatlock, M.A., Heidi G. Miller, Ph.D., Thomas E. Shenk, Ph.D., William M. Daley, J.D., Peter C. Wendell, M.B.A., Wendell P. Weeks, M.B.A., Shelly Lazarus, Edward M. Scolnick, H. Brewster Atwater, Jr., Dennis Weatherstone, Charles E. Exley, Jr., Lloyd C. Elam, Erskine Bowles, Rosemary Soluri, and Gia Orlando have been fraudulently joined and, therefore, do not need to consent to removal.

## II.    REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1332 AND 1441.

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, and is between citizens of different states.

### A.    Complete Diversity Of Citizenship

10.     There is complete diversity between Plaintiffs, citizens of New York, and Merck, a citizen of New Jersey, the only properly joined parties to this action.

11.     Upon information and belief, Plaintiffs are citizens of the State of New York.[2]

12.     Merck is, and was at the time Plaintiffs commenced this action, a corporation organized under the laws of the State of New Jersey with its principal place of business at One Merck Drive, White House Station, New Jersey and, therefore, is a citizen of New Jersey for purposes of determining diversity. 28 U.S.C. § 1332(c)(1).

13.     Defendants Does 1-100 ("other legal persons or entities who, directly or indirectly, promoted, sold, distributed, manufactured, labeled or advertised Vioxx in the State of New York") (Compl. ¶ 28) are fictional defendants and thus should be disregarded for purposes of determining diversity.  28 U.S.C. § 1441(a) ("For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded").

14.     For the reasons set forth below, the other named defendants William G. Bowen, Ph.D., William N. Kelley, M.D., Lawrence A. Bossidy, Samuel O. Thier, M.D., Johnetta B.

---

2.      Plaintiffs allege that they are citizens and residents of New York.  (Compl. ¶ 1.)  Plaintiffs allege no other alternative state of residence.  Accordingly, New York is the state in which Plaintiffs are domiciled and, therefore, the state of which they are citizens.  *See* 28 U.S.C. § 1332(a); *see also Linardos v. Fortuna*, 157 F.3d 945, 948 (2d Cir. 1998) ("[f]or purposes of diversity jurisdiction, a party's citizenship depends on his domicile.").

Cole, Ph.D., Raymond V. Gilmartin, M.B.A., William B. Harrison, Jr., Anne M. Tatlock, M.A.,

Heidi G. Miller, Ph.D., Thomas E. Shenk, Ph.D., William M. Daley, J.D., Peter C. Wendell,

M.B.A., Wendell P. Weeks, M.B.A., Shelly Lazarus, Edward M. Scolnick, H. Brewster Atwater,

Jr., Dennis Weatherstone, Charles E. Exley, Jr., Lloyd C. Elam, and Erskine B. Bowles

("Directors") and Rosemary Soluri and Gia Orlando ("Professional Representatives") are

fraudulently joined. Therefore, their citizenship must be ignored for the purpose of determining

the propriety of removal. *See, e.g., Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1359-60

(11th Cir. 1996), *abrogated on other grounds by Cohen v. Office Depot, Inc.*, 204 F.3d 1069

(11th Cir. 2000).

      15.    The citizenship of an individual is determined by his or her state of domicile.

*Linardos v. Fortuna*, 157 F.3d 945, 948 (2d Cir. 1988). Seven defendants are alleged to be New

York residents and therefore allegedly non-diverse from Plaintiffs. These are: Professional

Representatives Soluri and Orlando, and Directors Bowen, Harrison, Lazarus, Tatlock, and

Weeks. The Complaint alleges that Bowen and Harrison are residents of New York "pursuant to

Merck's public identification of its Board of Directors" (Compl. ¶¶ 4, 10.) However, the New

York address alleged in the Complaint for William G. Bowen is the address of the Andrew W.

Mellon Foundation. (Exhibit 2, attached hereto). Similarly, the address identified for William

B. Harrison is the address for JP Morgan Chase & Co. (Exhibit 3.) On information and belief,

Bowen is a resident of New Jersey and Harrison is a resident of Connecticut. Regardless, they

are fraudulently joined for the reasons listed below

      16.    A defendant is fraudulently joined when "there is no possibility, based on the

pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state

court." *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998). Courts have

interpreted this language to mean that a "reasonable basis" must exist for a plaintiff's claim

against a non-diverse party. *In Re Rezulin Prods. Liab. Litig. (Rezulin I)*, 133 F. Supp. 2d 272,

280 n. 4 (S.D.N.Y. 2001). The Directors and the Professional Representatives are fraudulently

joined because, as demonstrated below, no reasonable basis exists for Plaintiffs' claims against

them.

      17.     Plaintiffs assert eight product liability claims against Merck – similar to the

claims asserted against Merck in the Vioxx product liability cases that are now part of the MDL

proceeding. Although the causes of action are not formally identified in the Complaint, they

appear to allege the following claims: (1) negligence in manufacture, testing and failure to warn

of the risks of Vioxx; (2) strict liability – failure to warn; (3) strict liability – design defect; (4)

strict liability – unreasonably dangerous product; (5) breach of express warranty; (6) fraudulent

representation and violation of N.Y. General Business Law; (7) derivative claims on behalf of

Plaintiffs' spouses; and (8) punitive damages. All of the claims appear to be based on allegations

relating to the manufacture, sale and distribution of Vioxx. None of these claims are directed at

just the Directors and/or the Professional Representatives. Instead, all eight claims are directed

collectively at "defendants." As set forth below, there is no reasonable basis to predict that

Plaintiffs will prevail on any of these claims against either the Directors or the Professional

Representatives.

      **(1)**      **The Directors are Fraudulently Joined**

18.     The Directors are fraudulently joined because (1) the claims collectively directed against all defendants are conclusory and insufficient to state a claim; (2) there are no allegations that they directly participated in any wrongdoing in their individual capacities; (3) they cannot be held liable under a conspiracy theory; and (4) each of the individual causes of action are deficient as to the Directors under New York law.

19.     First, Plaintiffs do not make specific factual allegations sufficiently describing any alleged tortious conduct of any specific Director.  Instead, the Complaint sets forth broad, collective and conclusory claims against the "defendants" and the "directors" and few specific allegations. Numerous courts have recognized that in-state defendants are fraudulently joined where plaintiffs assert general claims against "defendants" that are clearly all aimed at the main defendant – in this case, Merck.  *See, e.g., In re Diet Drugs Prods. Liab. Litig. (Diet Drugs I)*, 220 F. Supp. 2d 414, 424 (E.D. Pa. 2002) (finding in-state defendants fraudulently joined where general allegations against all defendants "most properly can be read as stating claims against the drug manufacturers"); *In re Rezulin Prods. Liab. Litig. (Rezulin II)*, 168 F. Supp. 2d 136, 139-40 (S.D.N.Y. 2001) (pharmaceutical representative fraudulently joined where plaintiff made only general collective allegations regarding "defendants"); *see also Aetna Cas. & Sur. Co. v. Merchants Mut. Ins. Co.*, 444 N.Y.S.2d 79, 80 (1st Dep't 1981) (dismissing complaint where "causes of action are pleaded against all defendants collectively without any specification as to the precise tortious conduct charged to a particular defendant").

20.     Second, there is no reasonable basis to predict that Plaintiffs will prevail on any of their claims against the Directors, because they have not and cannot allege that the Directors

personally participated in any wrongdoing in their individual capacity.  While the Complaint

alleges generally that each Director was a primary participant in a fraudulent marketing scheme

(Compl. ¶ 24), the Complaint only contains a few sparse specific allegations against these

defendants.  As to the three non-diverse Directors, Lazarus, Tatlock and Weeks, the Complaint

alleges that Tatlock was a director who served on Merck's Finance Committee and the

Committee on Corporate Governance (Compl. ¶ 11), that Weeks was a director who served on

Merck's Audit Committee and Finance Committee (Compl. ¶ 16), and that Tatlock and Weeks

signed one or more of Merck's Form 10-Ks and Annual Reports which reported on certain

clinical results and stated that certain civil actions concerning Vioxx lacked merit. (Compl. ¶¶

169-170.)  The allegations against Bowen and Harrison also describe their service on the Board

(Compl. ¶¶ 4, 10) and include the same allegations regarding SEC filings.  (Compl. ¶¶ 169-170.)

There are no specific allegations against Lazarus other than that she began serving on the Board

in October 2004 (Compl. ¶ 17), the month after Vioxx was withdrawn from the worldwide

market.  (Compl. ¶ 165.)  Although Plaintiffs allege that the Directors exercised oversight and

decision-making authority (Compl. ¶ 168) and that the SEC filings evidence their knowledge of

Vioxx's alleged cardiovascular risks (¶¶ 169-170), such allegations simply do not support any of

the product liability claims against these outside directors.

21.    It is well-settled under New York law that directors and employees are not

personally liable for the torts of the corporation simply as a result of their positions, rather they

can only be liable for independent torts in which they individually participated.  *Simon v.*

*Castello*, 172 F.R.D. 103, 106 (S.D.N.Y. 1997) ("a corporate officer or director is liable for the

torts of the corporation only when he or she knowingly participated in the wrong") (quoting *Am.*

*Feed & Livestock Co. v. Kalfco, Inc.*, 540 N.Y.S.2d 354, 355 (3d Dep't 1989)); *Olszewski v. Waters of Orchard Park*, 758 N.Y.S.2d 716, 716-17 (4th Dep't 2003) (affirming dismissal of claim against corporate officer where no basis alleged for holding him personally liable); *Clark v. Pine Hill Homes, Inc.*, 492 N.Y.S.2d 253 (4th Dep't 1985) ("A corporate officer is not liable for the negligence for the corporation merely because of his official relationship to it. It must be shown that the officer was a participant in the wrongful conduct.") "The thrust of the general rule is that the officer to be held personally liable must have some direct, personal participation in the tort, 'as where the defendant was the 'guiding spirit' behind the wrongful conduct… or the 'central figure' in the challenged corporate activities.'" *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985), *citing Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 907 (1st Cir. 1980). Indeed, to hold otherwise, would be to hold that "any corporate officer who fails to maintain an almost total ignorance of the products the corporation produces may be personally liable in the event a defective product is produced." *Mozingo*, 752 F. 2d at 174. That is simply not the law.

22.     Nor is the allegation that the Directors were participants in a fraudulent marketing scheme (Compl. ¶ 24) sufficient to create liability for Merck's alleged actions. This appears to be an attempt to hold the Directors liable under a conspiracy theory. However, this is insufficient under New York law, because corporate officers, directors, and employees cannot conspire with one another. *Tufano v. One Toms Point Lane Corp.*, 64 F. Supp. 2d 119, 124-25 (E.D.N.Y. 1999) (dismissing conspiracy claim against board of directors, noting that "[u]nder the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together"), *aff'd*, 229 F.3d 1136 (2d Cir. 2000); *Valdan*

*Sportswear v. Montgomery Ward & Co.*, 591 F. Supp. 1188, 1191 (S.D.N.Y. 1984) ("The law is well settled that there is no conspiracy when two or more agents of a corporation take action on behalf of the corporation")(quotations and citations omitted); *Merkel Assocs., Inc. v. Bellofram Corp.*, 437 F. Supp. 612, 618 (W.D.N.Y. 1977) ("a corporation cannot conspire with its agents or officers, and co-employees of a corporation cannot conspire among themselves if the only connection is through their corporate-employer's affairs") (citations omitted). *See also Johnson v. Wyeth Corp.*, No. 1:02-CV-1368-TWT, 2003 U.S. Dist. LEXIS 15683, at *6 (N.D. Ga. Jan. 3, 2003) (finding corporate employees fraudulently joined; no possibility of recovering on conspiracy claims "because a corporation cannot conspire with its employees acting with the scope of their employment").

23.    Finally, as described in Paragraph 31 below, Plaintiffs have no reasonable basis for any of their specific causes of action against the Directors under New York law.

### (2)    The Professional Representatives are Fraudulently Joined

24.    The Professional Representatives are fraudulently joined for similar reasons:  (1) as noted above, Plaintiffs' claims against all the defendants – including the Professional Representatives – are simply lumped in with their claims against Merck; (2) there are no allegations that the Professional Representatives participated in any wrongdoing in their individual capacity; (3) they cannot be held liable under a conspiracy theory; (4) one of the Professional Representatives never did any work related to Vioxx, and the other worked with Vioxx only for a short time and had no dealings with Plaintiffs;  and (5) each of the individual causes of action is deficient under New York law.

10

25.     First, as with the Directors, Plaintiffs do not make specific factual allegations sufficiently describing tortious conduct of any specific Professional Representative.  Instead, the Complaint sets forth broad, collective and conclusory claims against the "defendants," and refers to the actions of seemingly all of Merck's "sales representatives."  As described above, such assertions are not sufficient to state a factual basis for any claims against any individual Professional Representative.  *See, e.g., Diet Drugs I*, 220 F. Supp. 2d at 424; *Rezulin II*, 168 F. Supp. 2d at 140; *Aetna*, 444 N.Y.S.2d at 80.

26.     Second, the few allegations against the two Professional Representatives named in this case – Rosemary Soluri and Gia Orlando – fail to support a claim.  The Complaint alleges generally that sales representatives presented misleading information supplied by Merck concerning Vioxx and its risks. (*E.g.*, Compl. ¶¶ 46, 82).  However, the allegations specific to Soluri and Orlando allege that they were and are professional sales representatives of Merck (Compl. ¶¶ 25, 26), that Merck trained them on a variety of topics including the risks of Vioxx (Compl. ¶ 143), and that Merck's allegedly false and misleading marketing scheme was enacted through its sales representatives, including Soluri and Orlando.  (Compl. ¶ 145.)  While plaintiffs generally assert that Merck trained approximately 3,000 sales representatives, including Soluri and Orlando, to misinform physicians, including plaintiff's physicians, concerning Vioxx (Complaint ¶ 142), there are no allegations in the Complaint that Soluri or Orlando ever met or made <u>any</u> representations at all to any Plaintiff or to any of Plaintiffs' prescribing physicians.  Indeed, the Complaint does not even identify any treating physician.

27.    As described above, it is well-settled under New York law that an employee of a corporation cannot be held personally liable for the torts of the corporation simply as a result of his or her position; rather such liability can only arise from torts in which the employee directly participated. *See*, *Simon*, 172 F.R.D. at 106; *Olszenski*, 758 N.Y.S.2d. at 716-17; *see also*, *Mozingo*, 752 F.2d at 174. Similarly, courts consistently have found professional sales representatives to be fraudulently joined in product liability and pharmaceutical cases in circumstances where they are not alleged to have committed an independent tort which caused injury to the plaintiff. *E.g.*, *Legg v. Wyeth*, No. 04-13489, 2005 U.S. App. LEXIS 23003, *6 (11th Cir. 2005) (finding that district court erred in concluding that sales representatives were not fraudulently joined; noting "dozens of district decisions finding that Wyeth sales representatives were fraudulently joined as defendants to defeat federal diversity jurisdiction."); *Morrow v. Wyeth*, No. Civ. A. B-05-209, 2005 WL 2621555, at *4 (S.D. Tex. Oct. 13, 2005) (sales representatives fraudulently joined on negligence and duty to warn claims because sales representatives had no duty separate from the manufacturer); *In re Diet Drugs Prods. Liab. Litig.* (*Diet Drugs II*), No. 03-20765, 2004 U.S. Dist. LEXIS 23150, at *14 (E.D. Pa. Aug. 12 2004) (finding fraudulent joinder where "sales representatives . . . served merely as conduits of information" from manufacturer); *Rezulin I*, 133 F. Supp. 2d at 286 (finding fraudulent joinder of sales representatives under Mississippi and Alabama law in lawsuit against drug manufacturer); *Walker v. Medtronic, Inc.*, No. 1:03CV74-D-D, 2003 U.S. Dist. LEXIS 26549 (E.D. Miss. 2003, at *9-10 (sales representative fraudulently joined when there were no specific allegations of individual wrongdoing); *Johnson v. Parke-Davis*, 114 F. Supp. 2d 522, 525 (S.D. Miss. 2000) (sales representatives owed no duty to warn because they had no connection with plaintiffs).

28.    Nor is the allegation that the Professional Representatives acted in concert and with a common purpose with the other defendants (Compl. ¶ 29) sufficient to create liability for Merck's alleged actions.  This appears to be an attempt to hold the Professional Representatives liable under a conspiracy theory.  However, this is insufficient under New York law, because, as described above, corporate officers, directors, and employees cannot conspire with one another.  *See Tufano*, 64 F. Supp. 2d at 125; *Valdan*, 591 F. Supp. at 1191; *Merkel*, 437 F. Supp. at 618.

29.    Furthermore, the court may look to evidence outside the complaint that demonstrates that an in-state defendant could not possibly have caused the plaintiff's alleged injuries.  *See Legg*, 2005 U.S. App. LEXIS 23003, at *8-14 (considering affidavits of sales representatives in making determination of fraudulent joinder); *Rezulin I*, 133 F. Supp. 2d at 281(citing affidavits of defendant sales representatives).  The attached declaration of Ms. Orlando, one of the Professional Representatives named in the Complaint, demonstrates that Ms. Orlando did not begin working for Merck until 2005, after Vioxx was voluntarily withdrawn from the market.  (Orlando Decl., Ex. 4, ¶ 2.)  Therefore, Ms. Orlando could not have had any connection to Plaintiffs' injuries and Plaintiffs indisputably cannot state a claim against Ms. Orlando.  As for Ms. Soluri, the only time period when her responsibilities included having discussions about Vioxx with healthcare professionals was the seven-month period from May 25, 2001 to December 31, 2001.  (Soluri Decl., Ex. 5, ¶ 2.)  Plaintiffs have made no factual allegations regarding any contact with Ms. Soluri, let alone a specific representation made by Ms. Soluri to them or their physicians.[3]  Ms. Soluri states that to the best of her knowledge, she never provided Vioxx or information concerning Vioxx directly to any of the Plaintiffs, nor has

---

3.    Plaintiffs do not identify their treating physicians or the time period during which they ingested Vioxx.

she ever otherwise met or spoken to any of the Plaintiffs. (*Id.* ¶¶ 7, 8.) Therefore, the claims against the Professional Representatives have no reasonable possibility of succeeding, and they are fraudulently joined.

30.    Finally, as described below, Plaintiffs have no reasonable basis for any of their specific causes of action against the Professional Representatives under New York law.

### (3)    Neither the Directors nor the Professional Representatives Can Be Held Liable for the Specific Claims Asserted Under New York Law

31.    A review of the specific causes of action alleged also demonstrates that the gravamen of the claims, although nominally asserted against "defendants," are directed against Merck, the manufacturer and seller of Vioxx and that Plaintiffs cannot state a claim against the other defendants. *Merkel*, 437 F. Supp. at 616 ("unless the facts support the implication that the term "defendants" includes all the defendants, the term will be given its most restrictive application.")

a.    Under New York law, only manufacturers, sellers, or distributors can be held liable for strict liability. *Bova v. Caterpillar, Inc.*, 761 N.Y.S.2d 85, 87 (2d Dep't 2003)("Liability cannot be imposed on a party that was outside the chain of manufacturing, selling, or distributing a product"); *Curry v. Davis*, 661 N.Y.S.2d 359, 360 (4th Dep't 1997) ("Because [defendant] is not a manufacturer, distributor, or retailer, it cannot be held liable under the doctrine of strict products liability"). There is no basis under New York law to hold individual defendants like the Directors or the Professional Representatives liable on strict liability claims. *See, e.g., Latin v. Affini*, 609 N.Y.S.2d 1013, 1015 (Sup. Ct. Queens County

1994) (dismissing product liability claim against individual employee of vendor, holding that there was no basis to hold him individually liable although he participated in sale, as he was acting in capacity as an employee, rather than as an individual). *See also DaCosta v. Novartis AG*, No. CV 01-800-BR, 2002 U.S. Dist. LEXIS 21313, at *21 (D. Or. Mar. 1, 2002) (sales representative was merely an employee of pharmaceutical company which was seller of drug, and therefore could not be held strictly liable for drugs promoted to physicians).

b.      Similarly, there is no reasonable basis to impose liability on the individual defendants for breach of warranty. *Diet Drugs I*, 220 F. Supp. 2d at 425 (sales representatives not liable as warrantors of product as they are not sellers); *Rezulin I*, 133 F. Supp. 2d at 286 (same); *Copeland v. Weyerhaeuser Co.*, 509 N.Y.S.2d 227, 228 (4th Dep't 1986) (dismissing warranty claim for failure to set forth terms of warranty which was allegedly made). As the court in *Rezulin I* stated, "The defendant sales representatives, however, were not 'sellers' of the product for purposes of warranty; the 'seller' who impliedly warranted the merchantability of Rezulin was the pharmaceutical manufacturer. In any case, there is no contention that the individual sales representatives 'sold' Rezulin to plaintiffs, either directly or indirectly." 133 F. Supp. 2d at 286.

c.      Similarly, to the extent the negligence claim is based on negligence in the manufacture and testing of Vioxx, there can be no claim against the Directors and Professional Representatives because there is no allegation that they participated in the manufacture or testing process. Nor are there any factual allegations to support a failure to warn claim against the individual defendants. Plaintiffs have not alleged any duty owed by the individual defendants to

Plaintiffs or that the breach of that duty caused their injuries. *Hamilton v. Beretta USA Corp.*, 727 N.Y.S.2d 7, 12 (N.Y. 2001) ("The injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her."). *See Rezulin I,* 133 F. Supp at 282 (no claim for failure to warn plaintiffs or public and no allegation that failed to warn particular physicians who prescribed drug to plaintiffs); *Johnson v. Parke-Davis*, 114 F. Supp. 2d at 525 (finding fraudulent joinder where no evidence that sales representatives provided plaintiffs or their physicians with drug and thus representatives could not have owed a duty to plaintiffs); *Palmer v. Wal-Mart Stores, Inc.*, 65 F. Supp. 2d 564, 567 (S.D. Tex. 1999) (individual manager fraudulently joined where no allegations that he owed duty of care to plaintiff independent of the corporate entity); *Johnson v. Wyeth*, 2003 U.S. Dist. LEXIS 15683, at *5-6 (finding fraudulent joinder of corporate employees of pharmaceutical company; plaintiffs could not recover on negligence claim because plaintiffs could not show misrepresentations relied upon by them or their physicians); *DaCosta*, 2002 U.S. Dist. LEXIS 21313, at *28-29 (pharmaceutical drug sales representatives have no duty to learn about risks of drug other than information provided to them by their employer, the drug manufacturer, and no duty to warn physicians of unknown risks).

      d.    An action for fraudulent misrepresentation under New York law requires "(1) misrepresentation, concealment, or nondisclosure of a material fact; (2) intent to deceive on the part of the defendant; (3) justifiable reliance upon the misrepresentation by the plaintiff; and (4) injury to the plaintiff as a result of such reliance." *Kramer v. Showa Denko K.K.*, 929 F. Supp. 733, 745 (S.D.N.Y. 1996). Here, the Complaint does not identify any specific misrepresentation made by the specific individual defendants with intent to deceive, justifiable reliance on that misrepresentation by the individual Plaintiffs, or injury caused by the reliance.

16

Thus, the Complaint fails to state a claim against the individual defendants with the particularity required by N.Y. CPLR 3016(b) and Fed. R. Civ. P. 9(b).  *E.g., EBC I, Inc. v. Goldman Sachs & Co.,* 777 N.Y.S.2d 440, 443 (1st Dep't 2004) (dismissal of fraud cause of action proper under 3016(b), as "[a]t the least, plaintiff should have identified the person(s) who made [the] misrepresentation"); *Rezulin I,* 133 F. Supp. 2d at 283-84 (finding in-state defendants fraudulently joined due to plaintiffs' failure to plead fraud claims with particularity and failure to allege a negligent representation made to them that they relied upon); *Johnson v. Parke-Davis,* 114 F. Supp. 2d at 525 (no misrepresentation claim stated where no plaintiff was the "hearer" of any misrepresentation and no connection between plaintiffs and sales representatives); *Simon,* 172 F.R.D. at 106 ("where multiple Defendants are alleged to have committed fraud, the Complaint must allege specifically the fraud perpetrated by each defendant")(quotations and citations omitted).

      e.      Similarly, the Complaint fails to state a claim that the individual defendants violated New York General Business Law §§ 349 and 350, part of New York's consumer protection statutes,[4] which requires deceptive acts and practices or false advertising, respectively, that impacts consumers at large, and that caused injury to plaintiff. *Gaidon v. Guardian Life Insurance Co. of America,* 94 N.Y.2d 330, 344 (N.Y. 1999); *Scott v. Bell Atlantic Corp.,* 282 A.D.2d 180, 184 (1st Dep't 1999); *Gale v. Int'l Bus. Mach. Corp.,* 781 N.Y.S. 2d 45, 46 (2d Dep't 2004).

---

4.      Plaintiffs cite to Sections 249 and 250 in their Complaint, but their quotes from the statute clearly are from Sections 349 and 350.  Sections 249 and 250 deal with airports and are not relevant.

f.      Because there is not reasonable basis for the substantive claims, there is also no basis for the derivative claims or the claims for punitive damages.

g.      In short, there is no possibility that Plaintiffs will prevail on any of their claims against the individual defendants. For this reason too, they are fraudulently joined and their citizenship should be ignored.

**B.      The Amount In Controversy Requirement Is Satisfied.**

32.      It is apparent from the face of the Complaint that Plaintiffs seek recovery of an amount in excess of $75,000, exclusive of costs and interest. Plaintiffs seek compensatory and punitive damages for alleged injuries that Plaintiffs allege were caused by their use of the pharmaceutical Vioxx, which was manufactured by Merck. The foregoing makes it apparent that the amount in controversy for Plaintiffs is well in excess of $75,000. *See, e.g., James v. Gardner*, No. 04 Civ. 1380(DGT)(KAM), 2004 U.S. Dist. LEXIS 23174, at *10 (E.D.N.Y. Nov. 10, 2004) (where plaintiff fails to represent a definitive amount in controversy, the court may look to defendant's petition for removal for a showing of reasonable probability that plaintiff's claim for damages exceeds the jurisdictional amount).

33.      Federal courts around the country have ruled that subject matter jurisdiction pursuant to 28 U.S.C. § 1332 exists in similar actions alleging personal injuries caused by Vioxx and, either explicitly or implicitly, concluded that the amount in controversy exceeded $75,000. *See, e.g., Morgan v. Merck & Co., Inc.*, No. 3:03cv435WS, slip op. at 2 (S.D. Miss. Mar. 29, 2004); *Benavidez v. Merck & Co., Inc.*, No. L-03-134, slip op. at 1 (S.D. Tex. Apr. 16, 2004); *Stubblefield v. Merck & Co., Inc.*, Civ. No. H-02-3139, slip op. at 1 (S.D. Tex. Oct. 8, 2002);

*Zeedyk v. Merck & Co., Inc.*, No. 02-C-4203, slip op. at 1 (N.D. Ill. August 30, 2002); *Abrusley v. Merck & Co., Inc.*, No. 02-0196, slip op. at 2 n.3 (W.D. La. June 18, 2002); *Jones v. Merck & Co., Inc.*, Civ. No. 02-00186, slip op. at 2 (D. Haw. June 5, 2002). (Slip opinions attached collectively, as Exhibit 6.) These courts were all confronted by similar complaints in which plaintiffs alleged that they suffered similar injuries as a result of their use of Vioxx, and all found, either explicitly or implicitly, that the requirements for federal diversity jurisdiction, including the amount in controversy, were satisfied.

WHEREFORE, Defendant Merck respectfully removes this action from the

Supreme Court of the State of New York pursuant to 28 U.S.C. § 1441.

DATED:    New York, New York
          November 20, 2005

                                    Respectfully submitted,

                                    HUGHES HUBBARD & REED LLP


                                    By: *Vilia B. Hayes*
                                        Vilia B. Hayes (4/13/05)

                                    One Battery Park Plaza
                                    New York, New York  10004-1482
                                    (212) 837-6000

                                    *Attorneys for Defendant Merck & Co., Inc.*

# Exhibit 1

STATE OF NEW YORK
SUPREME COURT : COUNTY OF MONROE
*******************************************************

PETER BOIANO and SYLVIA BOIANO,
Individually and as Husband and Wife,
151 Greenleaf Meadows
Rochester, NY  14612

ROBERT H. COENE and BEVERLY COENE,
Individually and as Husband and Wife,
201 Hampton Boulevard
Rochester, NY  14612

MUHAMED KULIJOF, Individually,
511 Backus Road
Webster, New York 14580

FELIX V. LaPINE, Individually,
327 River Heights Circle
Rochester, NY  14612

                               **Plaintiffs,**

        **vs.**

MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

WILLIAM G.  BOWEN, PH.D.
140 East 62nd Street
New York, New York  10021

WILLIAM N. KELLEY, M.D.
21 Penn Tower
3400 Spruce Street
Philadelphia, Pennsylvania  19104-4385

LAWRENCE A. BOSSIDY
104 West Mountain Road
Ridgefield, Connecticut  06877

**SUMMONS**

**Index No.** 2C05-11762

SAMUEL O. THIER, M.D.
55 Fruit Street
Bulfinch 370
Boston, Massachusetts  02114-2606

JOHNETTA B. COLE, PH.D.
900 East Washington Street
Greensboro, North Carolina  27401-3239

RAYMOND V. GILMARTIN, M.B.A.
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

WILLIAM B. HARRISON, JR.
270 Park Avenue
New York, New York  10017-2070

ANNE M. TATLOCK, M.A.
600 Fifth Avenue
New York, New York  10020

HEIDI G. MILLER, PH.D.
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

THOMAS E. SHENK, PH.D.
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

WILLIAM M.  DALEY, J.D.
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

PETER C. WENDELL, M.B.A.
2884 Sand Hill Road
Menlo Park, California  94025

WENDELL P. WEEKS, M.B.A.
1 Riverfront Plaza
Corning, New York  14831

2

SHELLY LAZARUS
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

EDWARD M. SCOLNICK
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

H. BREWSTER ATWATER, JR.
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

DENNIS WEATHERSTONE
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

CHARLES E. EXLEY, JR.
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

LLOYD C. ELAM
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

ERSKINE B. BOWLES
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

ROSEMARY SOLURI
1715 Hyde Park Boulevard
Niagara Falls, New York  14305

GIA ORLANDO
107 Huntington Meadows
Rochester, New York  14625

DOES 1 - 100
c/o MERCK & CO., INC.
One Merck Drive
White House Station, New Jersey  08889

                              Defendants.
***************************************************

**TO THE ABOVE NAMED DEFENDANTS:**

          **YOU ARE HEREBY SUMMONED** and required to serve upon plaintiffs'

attorneys an answer to the complaint in this action within twenty (20) days after the

service of this summons, exclusive of the day of service, or within thirty (30) days after

service is complete if this summons is not personally delivered to you within the State of

New York.  In case of your failure to answer, judgment will be taken against you by

default for the relief demanded in the complaint.

          The basis of the venue designated is the residence of all plaintiffs, namely,

the County of Monroe and State of New York.

DATED:      Buffalo, New York
            October 20, 2005

                              Yours, etc.,

                              **THE BARNES FIRM, P.C.**

          By:   _____
                Brian A. Goldstein, Esq.
                Attorneys for Plaintiffs
                17 Court Street, 7th Floor
                Buffalo, New York 14202-3290
                (716) 854-2020

4

STATE OF NEW YORK
SUPREME COURT : COUNTY OF MONROE
*******************************************************

PETER BOIANO and SYLVIA BOIANO,
Individually and as Husband and Wife,
ROBERT H. COENE and BEVERLY COENE,
Individually and as Husband and Wife,
MUHAMED KULIJOF, Individually,
FELIX V. LaPINE, Individually.

                       Plaintiffs,          **COMPLAINT**

    vs.

MERCK & CO., INC.,
WILLIAM G. BOWEN, PH.D.,
WILLIAM N. KELLEY, M.D.,
LAWRENCE A. BOSSIDY,
SAMUEL O. THIER, M.D.,
JOHNETTA B. COLE, PH.D.,
RAYMOND V. GILMARTIN, M.B.A.,
WILLIAM B. HARRISON, JR.,
ANNE M. TATLOCK, M.A.,
HEIDI G. MILLER, PH.D.,
THOMAS E. SHENK, PH.D.,
WILLIAM M. DALEY, J.D.,
PETER C. WENDELL, M.B.A.,                            **Index No.** 2005 - 11962
WENDELL P. WEEKS, M.B.A.,
SHELLY LAZARUS,
EDWARD M. SCOLNICK,
H. BREWSTER ATWATER, JR.,
DENNIS WEATHERSTONE,
CHARLES E. EXLEY, JR.,
LLOYD C. ELAM,
ERSKINE B. BOWLES,
ROSEMARY SOLURI,
GIA ORLANDO and
DOES 1 - 100,
                   Defendants.

*******************************************************

      The plaintiffs, PETER BOIANO and SYLVIA BOIANO, ROBERT H.

COENE and BEVERLY COENE, MUHAMED KULIJOF, FELIX V. LaPINE, by their

attorneys, THE BARNES FIRM, P.C., for their Complaint against each and every defendant allege:

**PARTIES**

1.      At all times relevant hereto, the plaintiffs PETER BOIANO and SYLVIA BOIANO, ROBERT H. COENE and BEVERLY COENE, MUHAMED KULIJOF, FELIX V. LaPINE, were and still are citizens of the State of New York and residents of the County of Monroe.  Plaintiffs SYLVIA BOIANO, BEVERLY COENE, claim is derivative of the claim presented by their spouses, plaintiffs PETER BOIANO and ROBERT H. COENE.

2.      At all times relevant hereto, Merck & Co., Inc. ("Merck"), was and still is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, White House Station, New Jersey 08889.

3.      At all times relevant hereto, Merck was engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling and marketing, either directly or indirectly through third parties or related entities, the pharmaceutical drug Rofecoxib which is sold under the brand name Vioxx ("Vioxx").

4.      Defendant William G. Bowen, Ph.D. ("Bowen") of 140 East 62nd Street, New York, New York 10021, has served as a Merck Director since 1986 and is a citizen of New York pursuant to Merck's public identification of its Board of Directors. Defendant Bowen served on Merck's Executive Committee in 2000-2004, the Committee on Corporate Governance in 2000-2004, the

Compensation and Benefits Committee in 2000-2004 and the Committee on Public Policy and Social Responsibility in 2001-2004.

5.    Defendant William N. Kelley, M.D. ("Kelley") of 21 Penn Tower, 3400 Spruce Street, Philadelphia, Pennsylvania 19104-4385 has served as a Merck Director since 1992 and is a citizen of Pennsylvania. Defendant Kelley served on Merck's Audit Committee in 2000, the Committee on Corporate Governance in 2000-2004 and the Compensation Benefits Committee in 2001-2004. Defendant Kelley is additionally a professor of Medicine, Biochemistry and Biophysics at the University of Pennsylvania School of Medicine.

6.    Defendant Lawrence A. Bossidy ("Bossidy") of 104 West Mountain Road, Ridgefield, Connecticut 06877 has served as a Merck Director since 1992 and is a citizen of Connecticut. Defendant Bossidy served on Merck's Executive Committee in 2001-2004, the Committee on Corporate Governance in 2000-2004, the Finance Committee in 2000 and the Compensation Committee in 2000-2004.

7.    Defendant Samuel O. Thier, M.D. ("Thier") of 55 Fruit Street, Bulfinch 370, Boston, Massachusetts 02114-2606 has served as a Merck Director since 1994 and is a citizen of Massachusetts. Defendant Thier served on Merck's Audit Committee in 2000-2004, the Executive Committee in 2000-2004, the Committee on Corporate Governance in 2000-2004, the Committee on Public Policy and Social Responsibility in 2001-2004 and the Research Committee in

2004. Defendant Thier is additionally a Professor of Medicine and Professor of Health Care Policy at Harvard Medical School.

8.     Defendant Johnetta B. Cole, Ph.D. ("Cole") of 900 East Washington Street, Greensboro, North Carolina 27401-3239 has served as a Merck Director since 1994 and is a citizen of North Carolina. Defendant Cole served on Merck's Finance Committee in 2000-2004, the Compensation and Benefits Committee in 2000-2004 and the Committee on Public Policy and Social Responsibility in 2001-2004.

9.     Defendant Raymond V. Gilmartin, M.B.A. ("Gilmartin") c/o Merck & Company, Inc., One Merck Drive, Whitehouse Station, New Jersey 08889-0100 served as Chairman of the Board of Directors, Chief Executive Officer and President of Merck from 1994 to May 6, 2005, presently serves as a Special Advisor to the Executive Committee of Merck's Board of Directors and is a citizen of New Jersey. Defendant Gilmartin served on Merck's Executive Committee from 2000-2004.

10.     Defendant William B. Harrison, Jr. ("Harrison") of 270 Park Avenue, New York, New York 10017-2070 has served as a Merck Director since 1999 and is a citizen of New York as identified in Merck's public identification of its Board of Directors. Defendant Harrison served on Merck's Audit Committee in 2000-2001 and the Committee on Public Policy and Social Responsibility in 2003-2004.

4

11.    Defendant Anne M. Tatlock, M.A. ("Tatlock") of 600 Fifth Avenue, New York, New York 10020 has served as a Merck Director since 2000 and is a citizen of New York. Defendant Tatlock served on Merck's Finance Committee and the Committee on Corporate Governance in 2001-2004.

12.    Defendant Heidi G. Miller, Ph.D. ("Miller") c/o Merck & Company, Inc., One Merck Drive, White House Station, New Jersey 08889 has served as a Merck Director since 2000 and is a citizen of Connecticut. Defendant Miller served on Merck's Audit Committee and Finance Committee in 2001-2004.

13.    Defendant Thomas E. Shenk, Ph.D. ("Shenk") c/o Merck & Company, Inc., One Merck Drive, White House Station, New Jersey 08889 has served as a Merck Director since 2001 and is a citizen of New Jersey. Defendant Shenk served on Merck's Audit Committee and the Committee on Public Policy and Social Responsibility in 2001-2004 and its Research Committee in 2004. Defendant Shenk is additionally the Elkins Professor (since 1984) and Chairman (since 1996) of the Department of Molecular Biology at Princeton University.

14.    Defendant William M.  Daley, J.D. ("Daley") c/o Merck & Company, Inc., One Merck Drive, White House Station, New Jersey 08889 has served as a Merck Director since April 23, 2002 and is a citizen of Illinois. Defendant Daley served on Merck's Committee on Public Policy and Social Responsibility in 2002-2003 and the Compensation and Benefits Committee in 2003.

5

15.    Defendant Peter C. Wendell, M.B.A. ("Wendell") of 2884 Sand Hill Road, Menlo Park, California 94025 has been a Merck Director since September 23, 2003 and is a citizen of California. Defendant Wendell served on Merck's Audit Committee in 2003-2004 and on its Research Committee in 2004.

16.    Defendant Wendell P. Weeks, M.B.A. ("Weeks") of 1 Riverfront Plaza, Corning, New York 14831 has served as a Merck Director since February 24, 2004 and is a citizen of New York. Defendant Wendell served on Merck's Audit Committee and Finance Committee in 2004.

17.    Defendant Shelly Lazarus ("Lazarus") c/o Merck & Company, Inc., One Merck Drive, White House Station, New Jersey 08889 has served as a Merck Director since October 2004 and is a citizen of New York. Defendant Lazarus is additionally the CEO of Ogilvy & Mather, one of Merck's lead advertising agencies since 1996.

18.    Defendant Edward M. Scolnick ("Scolnick") c/o Merck & Company, Inc., One Merck Drive, White House Station, New Jersey 08889 served as a Merck Director from 1997 until December 31, 2002 and is a citizen of Pennsylvania. From 1993 until December 31, 2002, defendant Scolnick also served Merck as Executive Vice President for Science and Technology and as President of Merck Research Laboratories.

19.    Defendant H. Brewster Atwater, Jr. ("Atwater") c/o Merck & Company, Inc., One Merck Drive, White House Station, New Jersey 08889 served as a Merck Director from 1988 until April 24, 2001 and is a citizen of Minnesota.

6

Defendant Atwater served on Merck's Compensation and Benefits Committee in 1999-2000, the Finance Committee in 1999-2001 and on its Executive Committee in 1999-2001.

20.     Defendant Dennis Weatherstone ("Weatherstone") c/o Merck & Company, Inc., One Merck Drive, White House Station, New Jersey 08889 served as a Merck Director from 1988 until April 24, 2001 and is a citizen of Connecticut. Defendant Weatherstone served on Merck's Finance Committee in 1999, its Audit Committee in 2000 and on its Committee on Directors in 1999-2000.

21.     Defendant Charles E. Exley, Jr. ("Exley") c/o Merck & Company, Inc., One Merck Drive, White House Station, New Jersey 08889 served as a Merck Director from 1988 until April 25, 2000 and is a citizen of Michigan. Defendant Exley served on Merck's Audit Committee and Finance Committee in 1999.

22.     Defendant Lloyd C. Elam ("Elam") c/o Merck & Company, Inc., One Merck Drive, White House Station, New Jersey 08889 served as a Merck Director from 1973 until April 24, 2001 and is a citizen of Tennessee. Defendant Atwater served on Merck's Executive Committee and Compensation and Benefits Committee in 1999-2000.

23.     Defendant Erskine B. Bowles ("Bowles") c/o Merck & Company, Inc., One Merck Drive, White House Station, New Jersey 08889 served as a Merck Director from April 24, 2001 to October 17, 2001 and is a citizen of North Carolina.

7

24.    At all times relevant hereto, within their individual terms of service, the Merck Directors (hereinafter collectively "Merck Directors" or 'Directors") engaged in the business of overseeing and controlling Merck's affairs by exercising sound and independent business judgment with respect to significant strategic and operational issues, including major capital expenditures, and ensuring Merck's compliance with all applicable laws and regulations. The Merck Directors were further charged with overseeing Merck's special obligations as a pharmaceutical company and for identifying, evaluating and capitalizing on Merck's pharmaceutical advancements including the pharmaceutical drug Vioxx. Each Merck Director is liable as a primary participant in a fraudulent marketing scheme and course of business that materially deceived the public regarding the truth concerning Vioxx, including its safety, efficacy and value to consumers including plaintiffs.

25.    Defendant Rosemary Soluri ("Soluri") of 1715 Hyde Park Boulevard, Erie Falls, New York 14305 is a citizen of the State of New York and was and is a professional sales representative of Merck.

26.    Defendant Gia Orlando ("Orlando") of 107 Huntington Meadows, Rochester, New York 14625 a citizen of the State of New York and was and is a professional sales representative of Merck.

27.    At all times relevant hereto, as professional sales representatives for Merck (collectively "sales representatives"), defendants engaged in the business of marketing pharmaceutical drugs, either directly or

8

indirectly through third parties or related entities, including the pharmaceutical drug Vioxx marketed to plaintiffs' physicians and ingested by plaintiffs PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE. Defendant sales representatives knew of the health risks inherent to Vioxx ingestion, yet fraudulently marketed the product by misrepresenting its safety and efficacy and with the intent that these materially false assertions would be reasonably relied upon by physicians and, indirectly, by the physicians' patients including plaintiffs.

28.    Doe Defendants 1 (one) through 100 (one hundred) inclusive are other legal persons or entities who, directly or indirectly, promoted, sold, distributed, manufactured, labeled or advertised Vioxx in the State of New York.

29.    At all times relevant each defendant acted in concert with and/or as the agent of the others, within the course and scope of such agency and with common purpose in furtherance of the actions and omissions relevant to the instant Complaint. Accordingly, the term "Merck" or "defendants" as used in this complaint denotes concerted action by defendants generally and pursuant to this paragraph.

## JURISDICTION, VENUE AND COORDINATION

30.    Plaintiffs PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE, and derivative plaintiffs, SYLVIA BOIANO, BEVERLY COENE, are and at all times relevant were citizens of the State of New York and residents of the County of Monroe.

31.    Merck, as an entity or through agents, including its directors and sales representatives, does and at all times relevant did transact regular business within

9

the State of New York and the County of Monroe including but not limited to the marketing and sale of pharmaceutical drugs in this State and County. These business transactions included but were not limited to the marketing and sales of the pharmaceutical drug Vioxx until September 30, 2004.

32. Plaintiffs PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE, ingestion of the pharmaceutical drug Vioxx, and the tortious harm resulting from that ingestion occurred in the State of New York and the County of Monroe.

33. Based upon the extent of tortious harm, plaintiffs PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE, and derivative plaintiffs, SYLVIA BOIANO, BEVERLY COENE, are entitled to damages in a sum conferring exclusive original jurisdiction upon a Supreme Court of the State of New York and exceeding the jurisdictional limits of all other state courts which would otherwise have jurisdiction over this matter.

34. In order to promote efficient resolution of the parties' civil action, and to the extent reasonably calculated to promote efficient resolution, plaintiffs have filed their complaint in a manner grouping similarly situated plaintiffs where causes of action contain overwhelmingly similar question of law and fact under a single caption. Plaintiffs to this civil action followed the process previously required of plaintiffs in analogous litigations in order to facilitate superior judicial economy and case management.

35.     Plaintiffs present identical, allegations against defendants in each action, ingested Vioxx in similar dosages and for overlapping periods, are of like age and sex and suffered like injuries, and accordingly present dominant overlapping questions of law and fact.

36.     Plaintiffs are among those plaintiffs represented by The Barnes Firm, P.C., who have brought or intend to bring civil actions against defendants in several judicial districts.    Coordination may be appropriate pursuant to Section 202 of the Uniform Civil Rules of the Supreme and County Courts.

## SUBSTANTIVE ALLEGATIONS

### A Brief Synopsis of Vioxx:  Uses and Value to Defendants

37.     Musculosketal problems producing pain and inflammation are common.  Until 1998, non-steroidal anti-inflammatory drugs ("NSAID's") such as aspirin, ibuprofen, and Naproxen (known under the brand name Aleve), were the most common medications for treating musculoskeletal problems.  NSAID's reduce inflammation and pain and are widely used to treat persons suffering from arthritis and muscle pain. Gastrointestinal (GI) side effects limit the use of NSAID's.  More than 100,000 patients are hospitalized and 16,500 die each year in the United States as a result of NSAID-associated GI events.

38.     Most NSAID's inhibit two enzymes -- cyclooxygenase-1 ("COX-1") and cyclooxygenase-2 ("COX-2") -- that are involved in the synthesis of important chemical compounds that control a wide variety of physiological functions throughout the body.  Those compounds are known as prostaglandins or prostanoids.  COX-1 is

11

associated with the maintenance of GI mucous and platelet aggregation. COX-2 is associated with response to pain and inflammation. Traditional NSAID's, such as aspirin, ibuprofen, and Naproxen, operate nonselectively. That is, traditional NSAID's inhibit both COX-1 and COX-2 at the same time. The beneficial effects of traditional NSAID's (i.e., the reduction of inflammation and pain) are related to the inhibition of COX-2. The harmful GI side effects are related to the suppression of COX-1.

39.    Unlike aspirin, ibuprofen, and Naproxen, Rofecoxib, sold by Merck under the brand name Vioxx, is a "selective" NSAID, which was designed to suppress COX-2 without materially affecting COX-1. The intent was to maintain the beneficial effects of traditional NSAID's (the reduction of inflammation and pain) while avoiding the risk of serious GI side effects.

40.    Merck's marketing campaign did not represent that Vioxx was any more effective than traditional NSAID's like aspirin, ibuprofen and Naproxen at treating inflammation and pain. Accordingly, Merck's marketing campaign necessarily relied upon the sole advantage of Vioxx's purported improved safety profile to justify the significantly higher expense for its new drug. Moreover, Merck marketed Vioxx to all populations served by traditional NSAID's rather than only those with a susceptibility to gastrointestinal risks.

41.    Vioxx was additionally important to the financial safety of Merck and, derivatively, to the financial positions of its Merck Directors and Merck Sales Representatives whose pay and/or bonuses derived from corporate sales and financial success. The patents for nine major drugs, accounting for more than 70% of Merck's

pharmaceutical sales in 1999 and more than 65% of total pharmaceutical sales in 2000, were set to expire by 2007. Merck's research and development failures, particularly its termination of trials on the failed depression drug MK-869 as announced on January 22, 1999, left Vioxx as a critical product to maintain corporate profits.

42.    Merck further recognized that rivals Pfizer and Monsanto already led the COX-2 inhibitor market based upon the Food and Drug Administration's December 31, 1998 approval of a New Drug Application ("NDA") for Celebrex. Pfizer and Monsanto had also initiated an aggressive launch for Celebrex, including offering patients free trials. Reflecting these efforts, the Wall Street Journal reported on April 14, 1999  that "Vioxx is already a step behind the competition in the huge, lucrative arthritis-relief market and that Celebrex had become "one of the most successful new drugs in industry history."

43.    According to a January 28, 1999 Prudential analyst report, based at least in part on information and guidance provided by Merck personnel, Merck expected to add 700 salespeople in the first half of 1999 to support the introduction of Vioxx and would counter with a major marketing campaign of its own. Notably, Merck began generating this marketing "buzz" months prior to FDA approval.

44.    In a subsequent Wall Street Journal article, published on January 10, 2001 and entitled  "When Its Patent Expired Merck Didn't Merge -- It Found New Drugs," defendant Scolnick reflected on Merck's immediate need for Vioxx and its reliance on two original compounds tested in developing the drug:  "If those first two

13

compounds had failed [in human trials] and we had by chance to rely on the fifth or sixth one" years later, he says "we would be a very different company."

45.    Merck's reliance on Vioxx, which became its second-best selling drug while its cardiovascular risks remained concealed, is reflected in its sales figures:

a.    In 2000, sales of Vioxx were more than $2.1 billion, approximately 10.7% of Merck's pharmaceutical sales, and more than 5.3% of the Company's total sales.

b.    In 2001, sales of Vioxx were more than $2.3 billion, more than 11% of Merck's pharmaceutical sales, and more than 4.9% of the Company's total sales.

c.    In 2002, sales of Vioxx were more than $2.5 billion, approximately 11.7% of Merck's pharmaceutical sales, and almost 4.9% of the Company's total sales.

d.    In 2003, sales of Vioxx were more than $2.5 billion, approximately 12.5% of Merck's pharmaceutical sales, and more than 11.4% of the Company's total sales.

e.    During the first six months of 2004, the year Vioxx was withdrawn, sales of Vioxx were more than $1.3 billion.

46.    In order to compete with the first-to-market competitor Celebrex and realize these profits, and the derivative profits earned by individual defendants, Merck engaged in a fraudulent marketing scheme for Vioxx that included (1) materially misleading direct-to-consumer advertising and public press releases that denied cardiovascular risks known to defendants, (2) materially misleading physicians and their patients by means of well educated and well trained sales representatives knowingly presenting misleading information and obfuscating cardiovascular risks

known to defendants, and (3) various other fraudulent marketing techniques including concealing cardiovascular risks by attacking professional studies evidencing that risk, by sponsoring professional speakers who would promote Vioxx while retaliating against professionals raising concerns, by providing physicians with free samples of its inadequately labeled and inherently dangerous product with the intent that these samples create a market for future sales and by making baseless marketing claims that Vioxx was in various ways superior to competing products such as Celebrex or traditional NSAID's.

### Defendants' Initial Fraudulent Marketing Scheme

47.     Merck submitted an Application to Market a New Drug for Human Use ("NDA") for Rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998 for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain and the treatment of primary dysmenorrhea.  The FDA denoted Merck's application as NDA 21-042.

48.     Merck also submitted an Application to Market a New Drug for Human Use for Rofecoxib to the FDA on November 23, 1998, for oral suspension, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.  The FDA denoted Merck's application as NDA 21-052.

49.     On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 for Rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

50.     Merck rushed Rofecoxib, under the brand name Vioxx, to market through a fast-tracked 6-month approval process permitted by the FDA.  Even so, Merck's product was second to market behind rival COX-2 inhibitor Celebrex (Celecoxib), a product placed into the market by competitor Pfizer that targeted the same market segment as Vioxx.

51.     Merck immediately initiated an aggressive marketing campaign, through extensive direct-to-consumer advertising and through well trained professional sales representatives personally targeting prescribing physicians, to promote Vioxx as a safe and effective pharmaceutical drug superior to its competitors' products.   Merck aggressively marketed Vioxx despite knowing that this drug's use raised significant safety concerns over hypertension, edema and/or cardiovascular events, as identified in adverse reports, clinical trials and various studies because it viewed a successful Vioxx launch to be critical in its competition with Pfizer's Celebrex.

52.     In order to capture market share with its second-to-market COX-2 inhibitor Vioxx, Merck spent $160.8 million in mass media advertising in 2000 alone. This made Vioxx the most heavily marketed drug in the direct-to-consumer advertising arena.  Retail Vioxx sales increased 360% from $329.5 million in 1999 to $1.5 billion in 2000.  The National Institute for Health Care Management Research and Education Foundation, *Prescription Drugs and Mass Media Advertising*, Nov. 2001, p. 2, 5, 7-9.

53.     Placing these numbers into context, Vioxx advertising costs in 2000 exceeded the advertising costs of well-known brand names such as Budweiser beer's $146 million or the $125 million PepsiCo spent advertising its flagship Pepsi product. Merck also markedly outspent rival Pfizer's $78.3 million advertising expense for Celebrex. The National Institute for Health Care Management Research and Education Foundation, *Prescription Drugs and Mass Media Advertising*, Nov. 2001, p. 5. Merck's direct-to-consumer advertising materially misrepresented its Vioxx product by promoting it as an effective remedy while materially omitting information regarding its known cardiovasucalr risks.

54.     Defendants knew and internally discussed Vioxx's cardiovascular risks prior to initiating their fraudulent marketing scheme. For example, as detailed in a November 1, 2004 Wall Street Journal article based on internal Merck documents and other sources, defendants had worried since the mid-to-late 1990s that while Vioxx would reduce the gastrointestinal risks associated with the older, cheaper painkillers that it sought to supplant it would also increase the risk of cardiovascular events. Merck corporate officials discussed in e-mails how best to design a study minimizing the comparison while acknowledging to themselves that the risks would be difficult to conceal.

55.     As reported in the Wall Street Journal article, a November 21, 1996 memo by a Merck official evidenced defendants' desire to conduct a clinical trial to prove Vioxx was gentler on the stomach than older painkillers. However, the trial precluded the Vioxx patients using aspirin, a traditional NSAID that would protect

against cardiovascular events but could cause the gastrointestinal events Vioxx was designed to circumvent.  Merck's officials commented that in such a trial "there is a substantial chance that significantly higher rates" of cardiovascular problems would be seen in the Vioxx group.  Merck would later carry out such a trial despite this risk.

56.     Another Merck official, Briggs Morrison, e-mailed similar concerns on February 25, 1997.  Mr. Morrison argued that unless patients in the Vioxx group also got aspirin, "you will get more thrombotic events" -- blood clots -- "and kill [the] drug." Alise Reicin, presently Merck's Vice President of Clinical Research, said in an e-mail that the Company was in a "no-win situation."  Giving study subjects both Vioxx and aspirin, she wrote, could increase the "relative risk," apparently referring to gastrointestinal problems.  But, she added, "The possibility of increased CV [cardiovascular] events is of great concern." From the context, it seems Dr. Reicin meant "increased" relative to older NSAID's.  She added in parentheses:  "I just can't wait to be the one to present those results to senior management!"  Dr. Reicin proposed that people with high risk of cardiovascular problems be kept out of the study so the difference in the rate of cardiovascular problems between the Vioxx patients and the others "would not be evident."

57.     In addition to tailoring studies to misrepresent Vioxx's cardiovascular risk, Merck's marketing scheme also released data only selectivly from prior studies.  For example, Merck's November 23, 1998 press release, which was issued more than six months prior to Vioxx being approved by the FDA stated: "[T]he [Vioxx NDA] application included results from 68 studies and nearly 10,000 patients that

evaluated Vioxx."   Merck, however, promoted these numbers without revealing its misrepresentative methodologies and without including adverse study results.

58.    Another example of Merck's misrepresentative practices, according to Dr. Eric Topol, Chief of Cardiovascular Medicine at the Cleveland Clinic who publicly commented on Vioxx during the November 14, 2004 edition of CBS's 60 Minutes television program, was a never-published 1998 internal Merck clinical trial entitled Study 090 that revealed, of 978 patients studied, serious cardiovascular events -- including heart attack and stroke -- occurred six times more frequently in patients given Vioxx than in patients given a different arthritis drug or placebo.

59.    Merck further evidenced its awareness of cardiovascular risks as early as 1998 by forming a committee of academic researchers to review the case reports for many patients who had suffered suspected heart problems in clinical trials of Vioxx and Arcoxia, a Merck arthritis drug developed as a potential successor to Vioxx that has never been approved.  As reported in an April 24, 2005 New York Times article, defendants distorted the results of a clinical study to hide the cardiovascular risks associated with Vioxx even while forming this committee.

60.    In addition to public press releases, defendants also deceived analysts with the intent that the analysts' publicized opinions would increase corporate profits while deceiving the public.  For example, on December 9, 1998, at Merck's annual analyst meeting, defendant Scolnick boasted: "Short-term high dose, long-term low dose, it's a wonderful drug . . . .  Vioxx has lived up to our highest expectations." According to Scolnick, in one major trial, Vioxx's safety profile showed "statistical

equivalence" to placebo. Scolnick further represented that Merck has "extensive data" documenting Vioxx's effectiveness in treating pain in different populations, a materially misleading statement in context as Merck failed to reveal its misrepresentative methodologies or admit to its adverse study results.

61.     Defendants also made material misrepresentations and omissions regarding the cardiovascular risks attributable to Vioxx in the drug's label leaflet. This leaflet is the multi-page, small print pamphlet inserted in the box in which a pharmaceutical product is sold. These material misrepresentations and omissions existed in each of the four label leaflets used during Vioxx's marketing.

62.     FDA regulations require a drug label leaflet to "contain a summary of the essential scientific information needed for the safe and effective use of the drug." 21 C.F.R. § 201.56(a)(2004). The label leaflet must be "informative and accurate and neither promotional in tone nor false or misleading in any particular." *Id.* at § 201.56(b). The regulations also require that information concerning risks associated with the drug be set forth in the following form:

> Contraindications: Under this section heading, the labeling shall describe those situations in which the drug should not be used because the risk of use clearly outweighs any possible benefit. These situations include administration of the drug to patients known to have a hypersensitivity to it; use of the drug in patients who, because of their particular age, sex, concomitant therapy, disease state, or other condition, have a substantial risk of being harmed by it; or continued use of the drug in the face of an unacceptably hazardous adverse reaction. Known hazards and not theoretical possibilities shall be listed . . . .
> 21 C.F.R. § 201.57(3)(v)(d).

> Warnings: Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. *The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved* . . . . 21 C.F.R. § 201.57(3) (v)(e) (emphasis added).

63.    Defendants recognized that including information about the cardiovascular risks in the Vioxx label leaflet -- particularly in the "Contraindications" and "Warnings" sections -- would adversely impact sales of Vioxx, especially because the Celebrex label leaflet only included general boilerplate language concerning possible cardiovascular risks, which was set forth at the very end of the label leaflet, after the "Contraindications" and "Warnings" sections.   None of the four different Vioxx label leaflets used when Vioxx was on the market contained any, yet alone truthful, language that adequately or properly disclosed Vioxx's cardiovascular risks in the "Contraindications" or "Warnings" sections.   Accordingly, all of the Vioxx labels wrongfully and intentionally minimized Vioxx's serious cardiovascular risks.

64.    The initial Vioxx label leaflet (the "First Vioxx Label"), which Merck used from May 21, 1999 through April 11, 2002, included the following materially misleading and general boilerplate language concerning "spontaneous events [that] occurred" in an Osteoarthritis Study:

> In the OA Studies, the following spontaneous events occurred in >0.1 to 1.9% of patients treated with Vioxx regardless of causality (emphasis added).   This general boilerplate language listed ten different body systems, including, among others "Body as Whole," "Eyes, Ears, Nose, and Throat," as well as "Cardiovascular System," which were then further broken down into more than 100

21

types of events, including "cough," "dry mouth," and "insect bite reaction." Similarly, the second section contained the following general boilerplate language: "Other serious adverse reactions which occur rarely (<0.1%), regardless of causality," which was followed by a list of four body systems, including Urogenital, and approximately 20 type events, including colitis and urolithiasis.

65. This first Vioxx label accordingly buried the threat of serious cardiovascular risks to Vioxx users and intentionally misled both prescribing physicians and consumers to believe whatever adverse cardiovascular events had been experienced by users of Vioxx were statistically irrelevant and mere coincidence.

66. This label additionally stated, in the section entitled "Special Studies -- Upper Endoscopy in Patients with Osteoarthritis," "Treatment with Vioxx 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing Vioxx to placebo." Accordingly, defendants materially omitted Vioxx's known cardiovascular risks in this label.

67. On or about November 1, 1999, defendants publicly issued two promotional pieces, entitled "TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX" and "Vioxx vs. Celebrex Poem." These marketing pieces presented misrepresentative assertions including: "VIOXX HAS ENDOSCOPY STUDIES SHOWING A SAFER THAN PLACEBO INCIDENCE RATE OF GASTRODUODENAL ULCERS;" "Your patients in pain – they give you their grief; A Cox-II is the answer for

22

their pain relief;" "Vioxx of course – the answer again, It's stronger, lasts longer, is faster, and then its safer . . . ."

68.    The November 1, 1999 promotional pieces were each materially false and misleading because, as the FDA admonished Merck in a Warning Letter referred to below (the "First Warning Letter"), they misrepresented Vioxx's safety profile, and made "unsubstantiated comparative claims" that were "lacking in fair balance." Additionally, Merck's press release safety claims were materially misleading because they failed to reveal the known cardiovascular risks of Vioxx ingestion.

69.    Merck's unprecedented marketing practices quickly came under FDA scrutiny.  On December 16, 1999, the FDA sent the First Warning Letter to Merck's Ellen R.  Westrick, Executive Director, Office of Medical/Legal.  Pursuant to FDA policy and practice, Warning Letters are sent only to address serious circumstances.   While  this  first  letter  addressed  misrepresentations  regarding gastrointestinal benefits, as defendants to date had successfully concealed the cardiovascular risks even from FDA scrutiny, the letter illustrates defendants' common course of misrepresentative marketing practices both in making unsupportable claims and in failing to disclose material risks.

70.    Specifically, the First Warning Letter stated that the "promotional pieces . . . that promoted Vioxx . . . are false or misleading because they contain misrepresentations of Vioxx's safety profile, unsubstantiated comparative claims, and are  lacking  in  fair  balance."    The  First  Warning  Letter  further  commented  on

"misrepresentations of Vioxx's safety profile" including the minimizing of risks identified in the in the drug's label leaflet.

71. For example, the FDA's First Warning Letter cited Merck's minimization of Vioxx's risks as deceptive:

> Although these pieces contain numerous claims for the efficacy and safety of Vioxx, you have not presented any risk information concerning the contraindications, warnings, precautions, or adverse events associated with Vioxx's use. Therefore, we consider these promotional pieces to be lacking in fair balance. Furthermore, these promotional pieces are in violation of the Act because the approved product labeling for Vioxx did not accompany them.

72. The TFDA's First Warning Letter also chastised Merck for making unfounded claims that Vioxx was better than Celebrex:

> You also present several unsubstantiated comparative claims to Celebrex (celecoxib), including but not limited to, "Vioxx of course - the answer again, It's stronger, lasts longer, is faster, and then it's safer . . . ." [The FDA found that] this claim suggests Vioxx is more efficacious and has a superior safety profile compared to Celebrex, when such has not been demonstrated by substantial evidence. Therefore, this unsubstantiated comparative claim is misleading.

73. Merck subsequently submitted a Supplemental New Drug Application ("SNDA"), denoted SNDA-007 by the FDA, with the goal of establishing a gastrointestinal ("GI") safety claim for Rofecoxib. In conjunction with the SNDA, Merck performed the Vioxx GL Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients with Rheumatoid Arthritis: U.S. Cohort."

74.     In designing the VIGOR Study, Merck took the exceptional step of including an "External Vascular Event Committee consisting of three separate subspecialty committees (cardiac, cerebrovascular, and peripheral), for surveillance, monitoring and adjudication of vascular events occurring in COX-2 inhibitor trials." As one prestigious medical journal, *The Lancet*, later concluded after learning that this committee had been formed as part of the VIGOR Study, Merck "apparently was aware of possible myocardial toxicity before the [VIGOR] trial, because it set in place a separate adjudication procedure to study the event."

75.     The VIGOR study was performed from January 6, 1999 to March 17, 2000. The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking Naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis." As Dr. Reicin had suggested in her February 25, 1997 e-mail, the study excluded patients at a high risk for heart problems and barred patients from ingesting aspirin that might have protected them from Vioxx's cardiovascular risks.

76.     Commenting subsequently on the VIGOR Study results, the FDA concluded: "[e]valuation of safety by routine parameters showed no advantage of [Vioxx] Rofecoxib over Naproxen." In fact, far from demonstrating an improved safety profile for Vioxx, as compared to Naproxen, the VIGOR Study also evidenced that:

a.     Patients on Vioxx were five times more likely to suffer a heart attack as compared to patients on Naproxen;

25

b.  Patients on Vioxx were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) as compared to patients on Naproxen; and

c.  Patients on Vioxx actually suffered more cases of serious disease (either gastrointestinal or cardiovascular) than did Naproxen users (61 and 57 cases respectively).

77.    In a March 9, 2000 e-mail entitled "Vigor," Merck's then-serving president of Merck Research Laboratories, defendant Dr. Scolnick, stated that the cardiovascular events "are clearly there." Dr. Scolnick's e-mail also stated that the events were "mechanism based," referring to the risk inherent to Vioxx's mechanism rather than solely to external causes such as any protective quality of Naproxen.

78.    Subsequently, in a videotaped deposition conducted on May 17, 2005, and played during a Vioxx trial on September 27, 2005, Dr. Scolnick testified regarding two studies conducted to determine whether Vioxx could delay the onset or worsening of Alzheimer's disease. In one, 13 people ingesting Vioxx died as compared to three taking a placebo. In the other, 21 patients ingesting Vioxx died as compared with nine taking the placebo. Scolnick further testified that mortality data "is data the physician should know" and that physicians prescribing Vioxx should have been told about the data in 2001.

79.    In his interview with 60 Minutes noted *supra*, Dr. Topol also discussed the significance of the VIGOR Study results:

Whenever you find a problem and you're thinking maybe it's not a problem, you want to see if there's independent replication. So if you have Study 090 and you want to

26

discount that somehow, then you have VIGOR. You've got two trials now. You have essentially lightning striking twice. That's independent replication. That's really serious confirmation. This is unequivocal. This is a problem.

80.    On March 27, 2000, Merck issued a press release assuring the public that the VIGOR Study did not show that Vioxx caused heart attacks or strokes. Defendants instead claimed that "significantly fewer thromboembolic events were observed in patients taking Naproxen in [the VIGOR Study], [that] is consistent with Naproxen's ability to block platelet aggregation . . . . Vioxx, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects." Defendants further stated:

> An extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx, showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and comparator NSAID's. Further analyses are ongoing, and final results of the GI outcomes study with Vioxx will be presented at peer-reviewed medical meetings this year.

81.    Defendants' public statements were materially misleading because they denied Vioxx's already known and mechanism-based cardiovascular risks. Defendants' statements were futher misleading for the reasons stated in the FDA's Second Warning Letter, dated September 17, 2001 and addressed infra. This letter specifcally condemned Merck's Naproxen theory as hypothetical, lacking in any evidentiary basis and presented selectively and to the exclusion of the possibility that Vioxx caused thromboembolic events.

82.    On April 28, 2000, in a response to the VIGOR study results, Merck issued its sales representatives a "Cardiovascular Card," a tri-fold pamphlet indicating that Vioxx patients were at reduced risk of death generally and specifically at a reduced risk of death from cardiovascular incidents such as heart attack and stroke.  Merck and its sales representatives intentionally misled physicians because this pamphlet lacked data that was standard and expected in medical communications and failed to include any adverse data from the VIGOR study or other studies evidencing Vioxx's cardiovascular risks.

83.    Merck's sales representatives were made aware and knew of Vioxx's cardiovascular risks while misleading their physician clients.   Shortly after Defendants introduced Vioxx to the market in May 1999, sales representatives had reported that Vioxx was responsible for causing cardiovascular events.  For example, in the summer of 1999, one sales representative reported to Merck that a customer, a neurologist,  had informed him that two of his patients had died as a result of using Vioxx.  This sales representative remains a confidential source identified in another lawsuit, the federal Multidistrict Litigation captioned *In re Merck & Co, Inc., Securities, Derivative & ERISA Litigation*, MDL No. 1658 (SRC) (D. N.J. 2005).

84.    Confidential sales representative sources in other Vioxx litigation have further identified the extent of sales representative participation.   Four such sources advised plaintiffs' counsel in *In re Merck & Co, Inc., Securities, Derivative & ERISA Litigation*, MDL No. 1658 (SRC) (D. N.J. 2005) that Merck directed representatives "to assure customers Vioxx did not cause heart attacks" and "to

28

downplay and minimize the cardiovascular findings from the VIGOR Study." These sources stated that it was known throughout Merck that Vioxx caused more heart attacks.

85.    The FDA Advisory Committee subsequently recognized that Merck's Cardiovascular Card relied on studies inappropriate for an overall analysis of cardiovascular safety. Food and Drug Administration, *FDA Advisory Committee Briefing Document, NDA 21-042, s007, Vioxx Gastrointestinal Safety*, 19 (Feb. 8, 2001.)

86.    The FDA had previously commented on Merck's inappropriate application of the same studies while advancing its position on gastrointestinal safety. Food and Drug Administration, Arthritis Advisory Committee, *Review of NDA #21-042, Vioxx (Rofecoxib) Merck Research Laboratories*, 162-167 (Apr. 20, 1999).

87.    Moreover, a February 1, 2000, FDA report written by Shari L. Targum, M.D., a Project Manager for the FDA's Division of Anti-Inflammatory Drug Products, stated:

> By November 18, 1999, the Data and Safety Monitoring Board of the VIGOR study, a committee independent from the sponsor, was concerned over the "excess deaths and cardiovascular events experienced in Group A [Vioxx group] compared to Group B [Naproxen group] (52 v. 29 respectively)."

88.    Asked subsequently to review the propriety of Merck's data, Dr. David J. Graham, Associate Director for Science, Office of Drug Safety at the FDA, reported that the relevance of the relied-upon studies was

"nonexistent" and that it would be "ridiculous" and "scientifically inappropriate" to use the data to present mortality comparisons to physicians.

89.    In addition to the VIGOR study, Merck also conducted the ADVANTAGe Study from March 1999 to April 2000.  Merck evaluated the effects of Vioxx (25 mg) versus the effects of Naproxen in patients with osteoarthritis.  Unlike the VIGOR Study, patients taking low dose aspirin to reduce the risk of heart attack were allowed to participate in the ADVANTAGe Study, thereby masking the actual risk of a cardiovascular event from Vioxx.

90.    The ADVANTAGe Study results would not be published until 2003 and then only in a misrepresentative form as they appeared in the *Annals of Internal Medicine*.  As reported in a later a New York Times article, entitled "Evidence in Vioxx Suits Shows Intervention by Merck Officials," Merck distorted the results of the ADVANTAGe Study to conceal the cardiovascular risks associated with Vioxx:

> During the ADVANTAGe trial, eight people taking Vioxx suffered heart attacks or sudden cardiac death, compared with just one taking Naproxen, according to data released by the F.D.A. earlier this year.  The difference was statistically significant, but Merck never disclosed the data that way.

91.    The New York Times article explained that the published results of the ADVANTAGe study "reported that five patients taking Vioxx had suffered heart attacks during the trial, compared with one taking Naproxen, a difference that did not reach statistical significance.  But the paper never mentioned the three additional cardiac deaths of patients taking Vioxx . . . ."

30

92.    Quoted in The New York Times article, Dr. Jeffrey R.  Lisse, a rheumatologist at the University of Arizona, who was listed as the study's first author, explained how defendants were able to conceal the actual results:

> Dr. Lisse said that while he was listed as the paper's first author, Merck actually wrote the report, an unusual practice.
>
> "Merck designed the trial, paid for the trial, ran the trial," Dr. Lisse said.  "Merck came to me after the study was completed and said, 'We want your help to work on the paper.' The initial paper was written at Merck, and then it was sent to me for editing."  Dr. Lisse said he had never heard of the case of the woman who died, until told of it by a reporter.  "Basically, I went with the cardiovascular data that was presented to me," he said.

93.    The April 24, 2005 New York Times article further reported that defendants feared that truthful disclosure of the actual results of the ADVANTAGe Study would threaten Vioxx's commercial success:

> Back in 2000, Merck was already struggling to explain the results of another study, called Vigor, which also indicated that patients taking Vioxx had more heart attacks than those taking Naproxen, which is found in over-the-counter drugs like Aleve.  Unlike the ADVANTAGe results, the Vigor results had been publicly disclosed by Merck.
>
> Dr. Scolnick expressed his worry in e-mail messages to other senior Merck scientists that the ADVANTAGe results would encourage the F.D.A. to demand that Vioxx's label highlight its cardiac risks.  Such a change would have damaged Vioxx's sales, especially because a competing drug, Celebrex, did not have heart risks prominently displayed on its warning label.  In e-mail messages on April 7, 2001, to Dr. Douglas A.  Greene, an executive vice president at Merck Research Laboratories, Dr. Scolnick wrote that he was especially angry because the ADVANTAGe trial had no scientific purpose.  In theory, Merck set up the trial to show that Vioxx caused fewer

stomach problems than Naproxen.  But Merck had already demonstrated that with the Vigor trial, which tracked more than 8,000 patients for a year.  As it turned out, Merck's marketing department had created the ADVANTAGe trial as a promotional tool, to introduce about 600 doctors to Vioxx.

"This course is just stupid," Dr. Scolnick wrote.  "Small marketing studies which are intellectually redundant are extremely dangerous."

94.    The article elaborated further on Defendants' successful efforts to

manipulate and conceal the ADVANTAGe Study's results:

In 1998, Merck had created a committee of academic researchers to review the case reports for many patients who had suffered suspected heart problems in clinical trials of Vioxx and Arcoxia, a Merck arthritis drug that has still not been approved.  But the woman's case never reached the outside committee because the cause of death listed on the death certificate from an independent autopsy -- hypertensive heart disease – did not fall into a category that would automatically prompt Merck to refer the case.  As a result, Merck reviewed the case internally.  After examining the case, Dr. Eliav Barr, a Merck scientist, initially judged that the woman had probably died of a heart attack.

"Common things being common, the clinical scenario is likely to be MI," Dr. Barr wrote in an e-mail message in November 2000 to Dr. Reicin, the clinical research executive.  MI is an abbreviation for myocardial infarction, or heart attack.  "Certainly, it is not definitive.  I just used my clinical judgment."

Dr. Reicin quickly responded, "I think this should be called an unknown cause of death." A few hours later, she wrote, "I would prefer unknown cause of death so we don't raise concerns."

95.    On April 28, 2000, Merck issued a press release to "confirm the

favorable cardiovascular safety profile of Vioxx" due to negative CNBC and Reuters

32

reports questioning the drug's cardiovascular risks.  Defendants' April 28 press release represented:

> Extensive review of data from the completed osteoarthritis trials and on-going clinical trials with Vioxx, as well as post-marketing experience with Vioxx have shown NO DIFFERENCE in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAID's and placebo.

96.     Defendants' press release was materially false and misleading in that it falsely represented that clinical trials showed no cardiovascular risk due to Vioxx and failed to disclose the truth with respect to Vioxx's adverse safety profile.    Study 090, the VIGOR Study and the ADVANTAGe Study had in fact made Merck well aware of the cardiovascular risks Vioxx posed to the consuming public.

97.     On May 1, 2000, Merck sent a bulletin to "all field personnel with responsibility for Vioxx."  The bulletin reiterated Merck's misrepresentative marketing policy that all sales representatives questioned about Vioxx's cardiovascular risks should refer physicians to the misleading and "scientifically inappropriate" information on the Cardiovascular Card.

98.     An article appearing in the May 3, 2000 Pharma Marketletter further illustrated Defendants' efforts to conceal Vioxx's cardiovascular risks.  The Pharma Marketletter noted that preliminary data from the VIGOR Study "may mean [Merck] will be questioned by the [FDA], according to CNBC and Reuters reports." The Pharma Marketletter, reported, however, that "in a statement, Merck said that 'in response to speculative news reports . . . it confirms the favorable cardiovascular profile of Vioxx.'" Defendants went on to claim that a review of data showed "no difference in the

incidence of cardiovascular events . . . among patients taking Vioxx, other NSAID's and placebo." Defendants' false assertions of cardiovascular safety materially misrepresented the qualities of their Vioxx product.

99. In the spring of 2000, Merck launched the "2000 Field Incentive Plan for Vioxx." This program offered sales representatives cumulative bonuses for gaining market share. In order to achieve these goals, Merck directed its sales representatives to stop defending questions concerning Vioxx safety and instead to offensively market Vioxx on its perceived efficacy. However, as noted *supra*, Vioxx presented no efficacy advantage over traditional NSAID's and instead relied upon gastrointestinal safety claims previously condemned by the FDA and defendants' ongoing concealment of cardiovascular risks.

100. By mid 2000, the FDA's Division of Drug Marketing, Advertising and Communications concluded that Merck's promotional activities included false material, lacked fair balance and were misleading in a manner prohibited by federal law. As examples, among other violations, the FDA specifically noted six promotional presentations in June and July 2000 by Dr. Peter Holt, and moderated by Merck employees, who minimized safety information including the VIGOR study, omitted important risk information, made unsubstantiated superiority claims and promoted Vioxx for unapproved uses and an unapproved

dosing regimen. The FDA documented these violations in its September 17, 2001, Warning Letter as addressed more fully *infra*.

101. An internal Merck e-mail, dated May 25, 2000, from Margie McGlynn, a Merck employee who worked in the Worldwide Human Health Marketing Department, to Dr. Reicin and by "carbon copy" e-mail to defendant Dr. Scolnick, illustrated defendants' successful and misrepresentative marketing scheme. In the email, entitled "VIGOR Analyst Reports," McGlynn stated:

> Alice, attached are 2 analyst reports which most clearly demonstrate the success of our efforts to defuse the CV risk issue for Vioxx. You played a major role in making this happen, along with Brian and I know many others supporting you in MRL. I wanted to personally thank you for all of your efforts and the tremendous support you provided for the marketing organization.

### Defendants' Misrepresentations Evolve to Defeat and Discredit Adverse Professional Study Results

102. In industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did Merck do nothing to further accurately publish these studies, or warn consumers, but it denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons Emerge From COX-2 Trials,* August 2000, p. 3.

103.  Merck continued to profit from its scheme by withholding information from plaintiffs, the consumer public generally and from the health care industry.  On November 23, 2000, Merck caused an article to be published in the *New England Journal of Medicine* under the title "Comparison of upper gastrointestinal toxicity of Rofecoxib and Naproxen in patients with rheumatoid arthritis VIGOR study group."  The article had several co-authors including Alise Reicin, Merck's Vice President of Clinical Research.  The lead author, Toronto rheumatologist Claire Bombardier, M.D., had then and has since had various relationships with Merck including serving as the chief investigator of the VIGOR study.

104.  The Bombardier/Reicin article followed Merck's policy of intentionally downplaying or avoiding publicizing material safety concerns and instead concluded only that "in patients with rheumatoid arthritis, treatment with Rofecoxib, a selective inhibitor of cyclooxygenase-2, is associated with significantly fewer clinically important upper gastrointestinal events than treatment with Naproxen, a nonselective inhibitor."  Merck's article omitted material safety concerns for cardiovascular events while promoting unsubstantiated gastrointestinal safety and efficacy claims.

105.  In its ongoing direct-to-consumer marketing scheme, Merck continued to deny or omit mention of the risks inherent to Vioxx consuption while at the same time reaping profits obtained through its non-disclosure and concealment. Merck's massive advertising and sampling scheme, to the detriment of consumers,

reaped more than $2 billion in corporate profit for the year 2000 alone and misappropriated approximately 23 percent share of the market.

106. In February, 2001, the FDA once again raised concerns regarding Vioxx safety. The FDA's Arthritis Advisory Committee reviewed VIGOR, the ADVANTAGe study, and studies 085 and 090 which identified a substantially and scientifically significant increase in events such as heart attack and stroke when Vioxx patients were compared with Naproxen patients. The FDA specifically addressed the studies forming the basis for Merck's Cardiovascular Card and deemed them inappropriate for conducting a safety analysis. *FDA Advisory Committee Briefing Document, NDA 21-042, s007, Vioxx Gastrointestinal Safety*, 9-12, 17-19 (Feb. 8, 2001.)

107. In support of its profitable product, Merck presented the committee with a pooled analysis of Vioxx trials. The FDA advised the Arthritis Advisory Committee that this metadata reevaluation practice was fundamentally flawed. The committee concluded that physicians should be informed that VIGOR evidenced "an excess of cardiovascular events in comparison to Naproxen."

108. The next day, Merck instructed its sales representatives to continue asserting their misrepresentative Vioxx arguments, not to initiate discussions regarding the committee's actions or the VIGOR study results and to instead reassure physicians by using the scientifically inappropriate Cardiovascular Card or other obfuscating methods.

109.   Merck additionally launched new Vioxx marketing programs including Project A&A XXceleration.   The "A&A" portion of the title referred to arthritis and analgesia, two clinical indications for Vioxx.   By April 27, 2001, Merck reported an all time high market share within this targeted market.

110.   On May 22, 2001, the New York Times published an article questioning Vioxx's cardiovascular safety.     Merck responded with a press release entitled "Merck Confirms Favorable Cardiovascular Safety of Vioxx." The release stated, among other things:  "In response to news and analyst reports of data the Company first released a year ago, Merck & Co., Inc.  today reconfirmed the favorable cardiovascular safety profile of Vioxx."

111.   On the day following the New York Times article, Merck sent a new bulletin to its sales respresentatives reiterating its previous directions not to initiate discussions of the VIGOR study and directing them not to initiate discussions of the New York Times' recent article.   The bulletin further directed the sales representatives to reassure physicians by using the scientifically inappropriate Cardiovascular Card and other obfuscating methods.

112.   On May 28, 2001, defendants issued another press release which again "reconfirmed the favorable cardiovascular safety profile of Vioxx."

113.   On June 13, 2001, Merck issued a press release announcing, among other things:

> In a new meta-analysis combining data from 19 clinical studies with Vioxx (Rofecoxib) involving more than 28,000 patients, the relative risks of serious cardiovascular events were similar with Vioxx and placebo, and with Vioxx and the

widely prescribed non-steroidal anti-inflammatory drugs (NSAID's) ibuprofen, dicofenac and nabumetone.

114.    The press release also quoted Dr. Reicin:

Results seen in the meta-analysis with Vioxx vs. Naproxen are consistent with the ability of Naproxen to block platelet aggregation, and, therefore, to act as an anti-platelet agent.

115.    On September 17, 2001, as discussed more fully *infra*, Thomas abrams, Director of the FDA's Division of Drug Marketing, Advertising, and Communications, sent Merck a Warning Letter referring to the May 22, 2001 press release as "simply incomprehensible" in the face of data from the VIGOR study.  As Director Abrams wrote:

Your claim in the press release that Vioxx has a "favorable cardiovascular profile" is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to Naproxen.  The implication that Vioxx's cardiovascular profile is superior to other NSAID's is misleading; in fact, serious cardiovascular events were twice as frequent in the Vioxx treatment group . . . as in the Naproxyn treatment group . . . in the Vioxx study.

116.    In June 2001, agents of the FDA's Division of Drug Marketing, Advertising, and Communications spoke with two Merck sales respresentatives at conferences in Ocean City, Maryland and in Los Angeles, California.  Both affirmatively misrepresented Vioxx safety issues.  The FDA addressed these misrepresentations in its September 17, 2001 Warning Letter as addressed more fully *infra*.

117.    On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D.  Mukhisjee, et al., showing that

Merck had concealed that the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in Merck's trials, including VIGOR, at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to Naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. *See* Mukhisjee, D., et al., *Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors,* J.A.M.A. 286:8, 954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.

118. In the JAMA study, the authors stated that "by decreasing PGI2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events." *Id.* at 957. In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the COX-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., *Why Do Cyclo-Oxygenase-2 Inhabitors Cause Cardiovascular Events?, J.A.C.C., 39:3,* Feb. 6, 2002.

119. On August 21, 2001, the day before the JAMA article was published, Bloomberg News reported that, in anticipation of the publication of the

Cleveland Clinic Study findings, Merck, through its Senior Director of Cardiovascular Clinical Research, Laura Demopoulos, commented: "We already have additional data beyond what they cite, and the findings are very, very reassuring. Vioxx does not result in any increase in cardiovascular events compared to placebo."

120.    Defendants not only falsely disparaged the Cleveland Clinic's findings prior to their release, but, according to a Wall Street Journal article dated August 22, 2001, Merck had previously taken affirmative steps to suppress publication of the Cleveland Clinic Study results. According to The Wall Street Journal article, the JAMA article's "release follows an unusual behind-the-scenes push by [Merck] to lobby the prominent cardiologists who wrote the study and the journal that published it . . . . Merck sought to downplay the cardiac issue -- in meetings in New York and Cleveland with Cleveland Clinic Doctors, in e-mails and in phone calls to the Cleveland doctors and the editor of JAMA."

121.    Also, according to The Wall Street Journal, Merck's Vice President of Medical Communications, Laurence Hirsch, asked JAMA to carry a rebuttal article to accompany the publication of the Cleveland Clinic's findings. The Wall Street Journal quoted Dr. Topol, one of the JAMA article's authors: "It was quite extraordinary and almost humorous that the company would do this."

122.    In addition, on August 23, 2001, the day after the release of the JAMA article, defendants continued to misrepresent Vioxx's cardiovascular risks by stating in a press release that "the Company stands behind the overall and cardiovascular safety profile . . . of Vioxx."

41

123.    Immediately after the publication of the JAMA article, defendants also sent, by Federal Express, "Dear Doctor" letters to physicians throughout the country disparaging the article as "not based on any new clinical study" and assuring the physicians that Merck "stands behind the overall and cardiovascular safety profile" of Vioxx.

124.    Merck further responded to the JAMA study with a bulletin directing its sales representatives to reassure physicians by using the scientifically inappropriate Cardiovascular Card or other obfuscating methods.

125.    On September 17, 2001, Thomas W. Abrams, R.Pb., MBA, Director of the Food and Drug Administration Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Defendant Gilmartin, then President and CEO of Merck, relating to "promotional activities and materials for the marketing of Vioxx (Rofecoxib) tablets."

126.    In addition to the incidents addressed *supra*, the Warning Letter stated that Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MI's) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (Naproxen).

127.    The eight (8) page Warning Letter outlines, in detail, the conduct of Merck that supports the Food and Drug Administration's issuance of the Warning Letter, and the following "Conclusions and Requested Actions:"

> The promotional activities and materials described above minimize the potentially serious Cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx / Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses.  On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

> Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.

> This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages.  This corrective action plan should also include:

> Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

> Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information.  This proposed letter should be submitted to us for review prior to its release.  After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

> A written statement of your intent to comply with "1" and "2" above.

128.  In the Fall of 2001, Merck launched "Project Offense" as a formal marketing strategy to emphasize Vioxx efficacy and safety.  In training sales representatives for this offensive strategy, Merck referred to physician concerns regarding cardiovascular safety as "obstacles."  Merck reinforced this characterization by preparing a training program entitled "Obstacle Response Guide for Vioxx."

129.  Merck also contemporaneously prepared a training program entitled "Dodge Ball Vioxx" for which most of the training manual's 16 pages stated a sample physician statement, such as "I am concerned about the cardiovascular effects of Vioxx" and "[t]he competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than Celebrex," and then stating a Merck-approved "dodge" response.  The final four pages of this document tellingly read, in their entirety, as follows:

DODGE!!

DODGE!!

DODGE!!

DODGE!!

130.  Merck's sales representatives were trained and advised to "dodge" and overcome these safety "obstacles" by comparing Vioxx and aspirin and then directed to review the scientifically inappropriate Cardiovascular Card with the physician in its entirety.

44

131.    Merck's sales representatives were also directed, and did refer physicians with persistent questions to its medical services department. Merck's written responses made use of the same scientifically inappropriate data used for the Cardiovascular Card.

132.    On November 6, 2001, Merck's Vice President of Clinical Research, Dr. Alise Reicin, and others authored an article in defense of Vioxx's cardiovascular risk profile entitled "Cardiovascular thrombotic events in controlled, clinical trials of Rofecoxib" in the journal *Circulation*.    Dr. Reicin and her fellow authors summarized their Vioxx assessment as follows:

> This analysis provides no evidence for an excess of CV [cardiovascular] events for Rofecoxib relative to either placebo or the non-Naproxen NSAID's that were studied.    Difference observed between Rofecoxib and Naproxen are likely the result of antiplatelet effects of the later agent.

133.    The FDA's September 17, 2001 Warning Letter, as detailed *supra*, explicitly addressed this position as part of a "promotional campaign for Vioxx that minimizes potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile of Vioxx." As the FDA explained:

> Although the exact reason for the increased rate of MI's observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MI's. You assert that Vioxx does not increase the risk of MI's and that the VIGOR study is consistent with Naproxen's ability to block platelet aggregation like aspirin.    That is a possible explanation, but you fail to disclose that the explanation is hypothetical, has not been demonstrated by substantial

45

evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.

134.    On January 12, 2002, Vanderbilt University researchers headed by Dr. Wayne Ray published an article entitled "Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease:  An Observational Cohort Study," in the journal *The Lancet*.    The article posited an explanation as to how COX-2 inhibitors promote thromboembolic events.

135.    Following Dr. Ray's article, on January 15, 2002, Merck employees led by Dr. Reicin, published an article entitled "Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with Rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs (Ibuprofen, Diclofenac, and Nabumetone), in the *American Journal of Cardiology*.    The Vioxx–supporting Merck authors concluded that "an analysis from the Rofecoxib osteoarthritis development program found no difference between Rofecoxib, comparator nonselective NSAID's, and placebo in the risks of cardiovascular thrombotic events."

136.    On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain.  The FDA also approved new labeling, a "Dear Doctor" letter and a new patient package insert.    The labeling and the "Dear Doctor" letter contained inadequate information concerning the results of the VIGOR study in the manner as prior labeling as discussed *supra*.

137.    The revised labeling further states that the administration of Vioxx 50 mg was associated with a higher incidence of gastrointestinal symptoms.

46

*Clinical Studies in OA and RA with Vioxx 50 mg (Twice the highest dose recommended for chronic use)*

In OA and RA clinical trials which contained Vioxx 12.5 or 25 mg as well as Vioxx 50 rug, Vioxx 50 mg OD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema, hypertension, serious 'adverse experiences and discontinuation due to cynical adverse experiences compared to the recommended chronic doses of 12.5 and 25mg (see DOSAGE AND ADMINISTRATION).

138.    The "Dear Doctor" letter, approved in conjunction with the revisions to the Vioxx labeling, merely outlined the changes to the Vioxx labeling.

139.    Merck's revised labeling remained misrepresentative and ineffective because it failed to disclose the truth with respect to Vioxx's adverse cardiovascular safety profile despite the VIGOR Study, and the ADVANTAGe study, and studies 085 and 090 having made Merck well aware of the cardiovascular risks posed to the consuming public.

140.    In negotiating the new label with the FDA, Merck successfully avoided the identification of cardiovascular risks with a "warning" label and instead relegated it to the lesser "precautions" section. Merck successfully refused to employ the method identified by the FDA as the best to clearly label cardiovascular risk information.   Merck further coerced a statement within the label that the significance of the VIGOR study and two other studies was "unknown."

141.    Following the new Vioxx labeling in April 2002, Merck modified its directives to its sales representatives.  Merck continued to prohibit sales representatives

47

from discussing new cardiovascular data, but now replaced the scientifically inappropriate Cardiovascular Card with language emphasizing the misleading "unknown" cardiovascular risk reflected by the specific studies identified on the new label.

142.  Merck employed approximately 3,000 of these sales representatives, including defendant sales representatives, for the purpose of marketing Vioxx to physicians. Merck trained these sales representatives to misinform physicians through affirmative material misrepresentations and omissions, including plaintiffs PETER BOIANO'S, ROBERT H. COENE'S, MUHAMED KULIJOF'S, FELIX V. LaPINE'S, prescribing physicians, regarding the health risks associated with Vioxx ingestion. Merck directed its sales representatives to enact this marketing scheme with the intent that the targeted physicians prescribe Vioxx to their patients without adequate knowledge of the drug's risks.

143.  Merck trained defendants Rosemary Soluri and Gia Orlando and its other sales representatives in a manner providing them knowledge of the risks inherent to Vioxx ingestion and in a variety of medical topics including pharmacology, anesthesiology, rheumatology and pain management. Merck intended that these well-trained sales representatives would be better able to communicate materially false and misleading statements and omissions to their physicians clients, to make these statements in a manner denying these prescribing physicians knowledge of the danger that they unwittingly passed

onto to their patients and with the intent that physicians and their patients rely upon this false information.

144.    Merck further trained its sales representatives in a variety of selling techniques and ensured the representatives possessed the verbal and non-verbal interpersonal communications skills necessary to convincingly communicate its materially false and misleading sales message.

145.    Merck furthered its materially false and misleading marketing scheme, enacted through its sales representatives including defendants Rosemary Soluri and Gia Orlando, to selectively present physicians only with that medical literature that favored Merck products.  Some Merck sales training materials referred to such literature as "approved" articles.  Contrary articles, called "background" in the same context, were not approved for use with physicians.  Merck advised its sales representatives that "this information cannot be used, and the articles cannot be referenced, during sales discussions with your customers."  Merck further warned its sales representatives that the use of "background" articles constituted "a clear violation of Company Policy."

146.    Merck closely tracked physician prescription practices and assigned individual physicians a "Merck potential" defined as a "dollar estimate of each prescriber's total prescribing volume that can realistically be converted to Merck products."  Merck's sales representatives were advised that their bonuses would reflect overall sales figures.  Merck provided these figures in a

manner permitting its sales representatives to directly correlate their physician-client's prescriptions to bonus money.

147. Merck also trained its sales representatives to coordinate speaker programs, sometimes referred to as Health Education Learning (HEL) programs, based upon the speaker's favorable view of Merck products and influence among other physicians. Merck paid a physician up to $2,000 per engagement for delivering these favorable views.

148. Merck further denied physicians knowledge of Vioxx's cardiovascular risks by retaliating against speakers who spoke of the drug's risks. For example, Merck canceled several presentations it had been scheduled to sponsor when Dr. Gurkirpal Singh of Stanford University, a prominent COX-2 expert, began commenting in his lectures that that the corporation was concealing VIGOR data.

149. In another example, Merck brought suit against Dr. Joan-Ramon Laporte of the Catalan Institute of Pharmacology in Barcelona, Spain. When the court ruled against the corporation, Merck cancelled its $140,000 sponsorship of an annual event at which Dr. Laporte was to be a featured speaker.

150. Merck's marketing efforts at the sales representative level continued unabated as well. For example, in 2003, Merck launched "Project Power Play" to focus on efficacy in order to "gain or extend" dominance in the market.

151.    Merck also continued directing its sales representatives with regard to misrepresenting Vioxx safety and to diverting physicians' questions. For example, on September 17, 2003, defendant directed its sales representatives to respond to a pending American College of Rheumatology abstract identifying an increased risk of heart attack in Vioxx patients by not initiating related discussions and by referring to the "unknown" language as stated on the drug's label leaflet.

152.    In the face of further adverse articles, Merck also continued its Vioxx defense efforts with Dr. Reicin and her Merck colleagues, publishing an article entitled "Selective COX-2 inhibition and cardiovascular effects:  a review of the Rofecoxib development program," published in the October 1, 2003 edition of the *American Heart Journal*.    Dr. Reicin and her colleagues continued to assert the Merck marketing line as follows:

> Rofecoxib was not associated with excess CV [cardiovascular] thrombotic events compared with either placebo or non-Naproxen NSAID's.    Again, Naproxen appeared to be the outlier, suggesting a cardioprotective benefit of Naproxen.

> The totality of the data is not consistent with an increased CV risk among patients taking Rofecoxib.

153.    Merck continued asserting these positions despite the FDA's condemnation of the selectively-asserted Naproxen theory and defendants' own knowledge of Vioxx's cardiovascular risks.

154.    On October 30, 2003, The Wall Street Journal published an article, entitled "Vioxx Study Sees Heart-Attack Risk," which revealed that a Merck-funded

study at Harvard University-affiliated Brigham and Women's Hospital in Boston (the "Brigham Study") found an increased risk of heart attack in patients taking Vioxx, compared with patients taking Pfizer's drug Celebrex, and compared with patients not taking any painkiller. The article stated:

> Brigham & Women's Hospital rheumatologist and epidemiologist Daniel H. Solomon headed the study, which looked at records of 54,475 Medicare patients, all of them over 65. Researchers found that the apparent cardiac risk was greatest in the first 90 days in which a patient is taking Vioxx, which generically is known as Rofecoxib. In the first 30 days, the researchers found, Vioxx was linked to a 39% increased heart attack risk compared with Celebrex. Between 30 and 90 days, that increased relative risk was 37%.

155. On November 2, 2003, in the face of the October 30, 2003 Wall Street Journal article, Dr. Reicin, Executive Director of Clinical Research for Merck, publicly denounced the study and announced: "In our placebo-controlled randomized trials, we have found no significant difference between Vioxx and placebo." Dr. Reicin also stated: "'Randomized clinical trials are the 'gold standard,' and this isn't such a trial." By denigrating the study's methodology, Dr. Reicin's comments misled physicians and the public acted to perpetuate the fraudulent concealment of Vioxx's cardiovascular risks.

156. Beginning in March 2004, however, defendants modified Merck's national direct-to-consumer television and print the advertisements. Prior to March 2004, those advertisements made no mention of any cardiovascular issues associated with Vioxx. The new 2004 advertisements stated that, if a patient has "a history of heart problems," that patient should consult with their physician before taking Vioxx. This



recommendation, however, further misled the public since Vioxx was a prescription drug and could not legally be purchased without a consultation with a physician and the tailored misrepresentations made to physicians by Merck sales representative and in publications meant that the new advertisements merely redirected consumers to additional misleading information.

157.    On or about April 6, 2004, defendants issued a new Vioxx label (the "Fourth Vioxx Label") to reflect that Vioxx had been approved for the acute treatment of migraine in adults.    Despite knowing Vioxx's cardiovascular risks through VIGOR, ADVANTAGe, studies 085 and 090, and evidence available through the ongoing Adenomatous Polyp Prevention on Vioxx (APPROVe) study and other sources, Merck prepared the Fourth Vioxx Label with essentially the same materially false and misleading statements concerning Vioxx's safety profile that were used in predecessor labels.

158.    In addition to these false and misleading statements, the Fourth Vioxx Label included an addendum, entitled "Patient Information about Vioxx." Although defendants were aware of Vioxx's adverse cardiovascular safety profile -- that it significantly increased the risk of heart attack and cardiovascular events for healthy individuals as well as for those with pre-existing heart conditions -- the Addendum was also materially false and misleading as it included a section on "Who should not take Vioxx," but failed to disclose that, as made clear by the withdrawal of Vioxx a little more than 5 months after the Addendum was issued, no patient should take Vioxx in the manner in which it had been marketed and prescribed by misled physicians.

159. Merck additionally weakened the representations concerning "possible side effects" by the introductory statement set forth in the Addendum: "This leaflet does not take the place of talking with your doctor about your condition or treatment." Having trained sales representatives to "dodge" physician questions and otherwise misinform the prescribing physicians, Merck knew that this statement merely referred consumers to further erroneous information resulting from its misinformation-based marketing campaign.

160. On August 22-25, 2004, at the 20th International Conference on Pharmacoepidemiology and Therapeutic Risk Management, David Graham, M.D., the Associate Director for Science and the FDA's Office of Drug Safety and the principal FDA investigator on a study performed to investigate the cardiovascular risk of the COX-2 selective NSAID'S including Vioxx, made a poster presentation entitled "Risk of Acute Myocardial Infarction and Sudden cardiac Death with Use of COX-2 Selective and Non-Selective NSAID's."

161. Dr. Graham's presentation, taken from a Kaiser Permanente study under a contract funded by the FDA, concluded that Vioxx taken at more than 25 mg per day increased the risk of heart attack and sudden cardiac death by 300% in those enrolled in the study.

162. On August 26, 2004, Peter Kim, defendant Dr. Scolnick's replacement as President of Merck Research Laboratories, issued a press release stating the following:

> Merck strongly disagrees with the conclusions of an observational analysis by Graham, et al., presented at an international medical meeting this week . . . .
> Merck stands behind the efficacy and safety, including the cardiovascular safety, of Vioxx.

163.  On September 27, 2004, however, Merck informed the FDA that the Data Safety Monitoring Board for an ongoing long-term study of Vioxx, known as the Adenomatous Polyp Prevention on Vioxx (APPROVe) study, had recommended that the study be terminated early for safety reasons.   As its names suggests, Merck did not initiate the APPROVe study as a cardiovascular risk assessment study.  Instead, Merck initiated this study to determine Vioxx's effect on people with risk for developing recurrent colon polyps and expand the drug's applications to a new market segment.

164.  Rather than offering further opportunity to exploit the NSAID market, however, Merck's APPROVe study demonstrated an increased risk of cardiovascular adverse events, including heart attacks and strokes, for the Vioxx population relative to the study's placebo population.  This risk was particularly evident for people taking Vioxx for more than 18 months.

165.  On September 28, 2004, just over one month following Dr. Kim's reassertion of Vioxx's "cardiovascular safety" and strong disagreement with Dr. Graham's conclusions, Merck officials informed the FDA that it would withdraw Vioxx from the United States pharmaceutical market.

166.  On September 30, 2004, Merck finally announced in a "Dear Healthcare Professional" letter  that Vioxx ingestion placed consumers at an

increased risk for cardiovascular events, such as heart attack and stroke, and withdrew Vioxx from the market.

167.    Despite this belated admission, on the night of September 30, 2004 during an episode of the PBS Nightly Business Report, Merck continued its obfuscating scheme by falsely assuring the public that it had remained ignorant of Vioxx's cardiovascular risks until the APPROVe study.  Defendant Gilmartin falsely stated: "It was totally unexpected.  But my instinctive reaction when Doctor Peter Kim called me to inform me of this was to say to him immediately, Peter, we're going to make this decision based on patient safety."

168.    Defendant Gilmartin, as a member of Merck's board, evidences the knowledge and direct control that Merck Directors exercised over Vioxx marketing. Defendant Directors have repeatedly admitted to the Securities and Exchange Commission (SEC) that they exercised oversight and decision-making authority regarding strategic areas of importance, including "basic research and clinical development" and "global marketing and sales," as well as associated funding authorizations.

169.    Merck Director public statements in SEC filings further evidence their knowledge of Vioxx's clinical results.  For example, in Merck's 2000 Report on Form 10-K filed with the SEC, defendants Gilmartin, Bossidy, Bowen, Cole, Kelley, Miller, Tatlock and Thier stated, with relevant emphasis added here:

> In May 2000, Merck presented results from an 8,000 patient *Vioxx Gastrointestinal Outcomes Research*

> *(VIGOR) study* . . . in which Vioxx reduced the
> incidence of serious gastrointestinal side effects, such
> as ulcers and bleeding, by more than 50% compared to
> the nonsteroidal anti-inflammatory drug Naproxen . . . .
> In February 2001, an FRDA arthritis Advisory
> Committee recommended that the gastrointestinal
> [VIGOR] study results, as well as data on *certain
> cardiovascular events*, be included in the [Vioxx]
> labeling . . . .

*See also* Merck's 2001 Report on Form 10-K and 2002 Annual Report signed and/or approved by defendants Bossidy, Bowden, Cole, Gilmartin, Henriques, Lewent, Miller, Sheck, Thier and/or Tatlock, and filed with the SEC.

170.    Similarly, in 2003, defendants Bossidy, Bowen, Cole, Daley, Gilmartin, Harrison, Kelley, Miller, Shenk, Thier, Weeks and/or Wendell stated that the earliest-filed Vioxx personal injury and product liability civil actions alleging death and injury resulting from cardiovascular events caused by Vioxx lacked merit.    Defendant Board Directors' ability to make this assertion necessarily rests upon their possessing sufficient knowledge to evaluate Vioxx's cardiovascular risks.

171.    It is additionally telling that Merck Directors included among their number defendant Kelley who is a Professor of Medicine at the University of Pennsylvania School of Medicine, Defendant Thier who is a Professor of Medicine at Harvard University Medical School, Defendant Schenk who is a Professor of Molecular Biology at Princeton University, and Defendant Scolnick who served as Merck's Chief Scientist.    Moreover, the FDA directed its September 17, 2001 warning letter personally to defendant Gilmartin. Defendant

Board Directors accordingly possessed the knowledge and experience, in addition to the duty, to have analyzed Vioxx's cardiovascular risk when they oversaw and approved the drug's fraudulent marketing.

172. As direct participants who oversaw and approved the fraudulent Vioxx marketing scheme in each year of its sales, and who personally benefited through increased salary, bonuses, fees and stock value, defendant Board Directors constitute proper defendants to plaintiffs' civil action.

173. At the time of withdrawal, defendants' fraudulent marketing scheme had induced over 2 million patients worldwide to take Vioxx. Over 100 million prescriptions had been dispensed in the United States alone. Merck's Vioxx product had also caused American patients suffer as many as 88,000 to 140,000 heart attacks and strokes in addition to other serious medical complications. Dai, Carolanne, et al., *National Trends in Cyclooxygenase-2 Inhibitor Use Since Market Release, Archives of Internal Medicine*, 171-177 (Jan. 24, 2005).

174. Contemporaneously with Merck's withdrawal of Vioxx from the worldwide market, on September 30, 2004, the FDA's Dr. Graham released a preliminary memorandum entitled "Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with Cox-2 Selective and Non-Selective NSAID'S." Dr. Graham's memorandum reviewed three studies upon which Merck relied, two of which were funded by Merck itself, to downplay the cardiovascular risk identified in the VIGOR study by alleging a protective quality

for Naproxen.    Dr. Graham concluded that all three studies suffered from significant defects and that these "studies that reported a protective effect were misleading."

175.  Dr. Graham's analysis further projected that 27,785 heart attacks and sudden cardiac deaths "would have been avoided" had Merck's victims used Pfizer's product Celebrex rather than Vioxx.

176.  Following Merck's withdrawal of Vioxx, the corporation's stock price immediately plummeted 27%.  Mathews, Anna Wild and Martinez, Barbara, *The Wall Street Journal*, p.  A1, Nov. 1 2004.

177.  At all times relevant to this litigation, Merck's Vioxx-derived value and market share resulted from its fraudulent marketing scheme falsely asserting the drug's safety and efficacy.  Defendants, despite knowing Vioxx's cardiovascular risks, jointly and concertedly enacted this scheme by means of (1) materially misleading direct-to-consumer advertising that induced reasonable reliance in plaintiffs and other consumers generally, (2) materially misleading sales representative marketing practices that induced reasonable physician reliance, denied physicians their traditional roles as learned intermediaries between drug manufacturers and patients, and derivatively reasonably induced plaintiffs and other patients to believe false claims of safety and efficacy, (3) materially misleading both the general public and physicians by falsely asserting Vioxx safety and efficacy in press releases and publications and (4) otherwise fraudulently inducing physicians and consumer reliance in the manners discussed *supra*.

178. Absent defendants' material misrepresentations and omissions, consumers -- including PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE -- would have either wholly refrained from using Vioxx and similar COX-2 pharmaceuticals or switched from Vioxx to safer pharmaceutical products such as Celebrex or traditional NSAID's.

179. Similarly, absent defendants' material misrepresentations and omissions, physicians including plaintiffs' prescribing physician, would have either wholly refrained from prescribing Vioxx or switched from Vioxx to a safer pharmaceutical products.

180. The harm suffered by plaintiffs PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE, and the derivative harm suffered by plaintiff's SYLVIA BOIANO, BEVERLY COENE, resulted directly and proximately from defendants' joint and concerted fraudulent marketing scheme and the reasonable reliance induced by that fraud.

181. Defendants' fraudulent concealment of Vioxx's cardiovascular risks, both before and after defendants globally withdrew the drug, intentionally denied plaintiffs vital knowledge and information regarding their claims without any fault or lack of diligence on their parts. Accordingly, any relevant statute of limitations has been tolled to at least September 30, 2004, when Merck first publicly acknowledged some risks inherent to Vioxx in conjunction with its global withdrawal of this defective product.

## CAUSES OF ACTION
## AS AND FOR A FIRST CAUSE OF ACTION AGAINST
## DEFENDANTS NAMED HEREIN, PLAINTIFFS
## PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE
## ALLEGE:

182.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1 " through "181" of the Complaint herein with the same force and effect as if fully set forth herein.

183.    Defendants    researched,    developed,    designed,    tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical drug, Vioxx, and in the course of same, directly advertised or marketed the product to the Food and Drug Administration, consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Vioxx.

184.    At all relevant times, defendants had a duty to exercise reasonable care and caution in the manufacture of the drug Vioxx for resale to the general public, so as not to injure any person who consumed the drug.

185.    At all times relevant, defendants had a duty to adequately and properly test the drug Vioxx to ensure its safety for oral consumption.

186.    Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of Vioxx because no reasonable medical care

provider would have prescribed, or no consumer would have used, Vioxx had those facts been made known to such providers and consumers.

187. Defendants failed to perform and or otherwise failed to facilitate adequate testing which would have shown that Vioxx posed serious and potentially life-threatening side effects and complications. Warnings accurately and fully reflecting the symptoms, scope and severity of these side effects and complaints should have been made to medical care providers including plaintiffs' physician(s), the Food and Drug Administration and the public, including the plaintiffs.

188. Defendants knew or should have known of the risk of serious and potentially life-threatening side effects and complications from the use of Vioxx. Defendants recklessly and negligently produced, manufactured, promoted, advertised, sold and distributed the dangerous medication, Vioxx as a safe COX-2 inhibitor, when in fact Vioxx is potentially harmful to human health in that it poses a greater likelihood of injury than other nonsteroidal antiinflammatory medicines and similar drugs on the market and is more dangerous than ordinary consumers could reasonably foresee.

189. Vioxx, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by defendants, was defective due to inadequate post-marketing warnings and/or instruction because, after defendants knew or should have known of the risk of serious and potentially life-threatening side effects and complications from the use of Vioxx, defendants failed to provided adequate warnings to

medical care providers, the Food and Drug Administration and the consuming public, including plaintiffs, and continued to promote Vioxx aggressively.

190.    Defendants' negligence consisted, among other things, of the following:

a.    failing to give proper and sufficient instruction to the medical profession, consumers and the general public in connection with the drug Vioxx.

b.    failing to give proper and adequate notice and warnings to medical care providers, the Food and Drug Administration and the consuming public, including plaintiffs, of the dangers inherent in the use of the drug Vioxx;

c.    requesting physicians to prescribe Vioxx for their patients;

d.    failing to take the ordinary, proper and prudent precautions and safeguards to prevent injuries; and

e.    failing to timely remove the drug from the market after becoming aware that the drug Vioxx was dangerous and harmful to human health.

191.    As a proximate result of the defendants' negligence in their failure to properly manufacture, test and label their products, and their willful and intentional failure to warn plaintiffs', plaintiffs' physicians, and other reasonably foreseeable users of the severe hazards associated with the use of Vioxx, the plaintiffs sustained bodily injury.

192.    The plaintiffs did not contribute in any manner to their own injuries.

193.    As a result of the foregoing, plaintiffs have sustained bodily injury and suffered great pain and suffering, and have incurred and will continue to incur

medical expenses and economic losses, in an amount exceeding the jurisdictional limits of all other courts which would otherwise have jurisdiction over this matter.

194. The intentional and willful conduct above complained of against the defendants was aimed against the public as well as plaintiffs; was grossly unjust and involved high moral culpability for which punitive damages should be assessed in a sum of money to be determined by the trier-of-fact.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE ALLEGE:

195. Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "194" of the Complaint herein with the same force and effect as if fully set forth herein.

196. Defendants willfully and intentionally refused to disclose known risks and hazards associated with the use of Vioxx, a product which they manufactured and/or placed into the stream of commerce.

197. Vioxx was under the exclusive control of defendants as aforesaid, and was unaccompanied by appropriate warnings regarding all reasonably possible adverse side effects and complications associated with its use and the comparative severty, duration and extent of risk of surgery; said side effects and complications included, but were not limited to thrombotic events, dangerous drug-drug interactions and food-drug interactions.

198. As a result of defendants' failure to give adequate warnings of Vioxx's danger, or to give adequate instructions, Vioxx was manufactured and

marketed in a defective condition to plaintiffs' and plaintiffs' physicians as well as the general public, was unreasonably dangerous to users such as the plaintiffs, and proximately caused plaintiffs' injuries and damages.

199.   Defendants are strictly liable to the plaintiffs for designing, manufacturing, and placing into the stream of commerce a product which was defective due to inadequate warnings at the time it left defendants' control.

200.   Plaintiffs used Vioxx for the purpose and in the manner normally intended.

201.   Plaintiffs were unaware of and could not have, in the exercise of reasonable care, discovered the defects and hazardous nature of Vioxx, nor perceived the dangers thereof, nor otherwise averted their injuries and damages.

202.   By reason of the foregoing, defendants are strictly liable to plaintiffs in the amount and respects set forth in plaintiffs' prayer for relief *infra*.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE ALLEGE:

203.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "202" of the Complaint herein with the same force and effect as if fully set forth herein.

204.   At all relevant times, defendants had a duty to exercise reasonable care and caution in the manufacture of the drug Vioxx for resale to the general public, so as not to injure any person who consumed the drug.

205.   Vioxx is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation. Vioxx is defective in design or formulation in that it lacks efficacy and/or it poses a greater likelihood of injury than other nonsteroidal anti-inflammatory medicines and similar drugs on the market and is more dangerous than ordinary consumers can reasonably foresee.

206.   The defective condition of Vioxx renders it unreasonably dangerous, and Vioxx was in this defective condition at the time it left defendants' control. Vioxx was expected to and did reach consumers, including plaintiffs, without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

207.   Plaintiffs were unaware of and could not have, in the exercise of reasonable care, discovered the significant hazards and defects in Vioxx. Vioxx was unreasonably dangerous in that it was more dangerous than would be reasonably contemplated by the ordinary user.

208.   During the period that plaintiffs took Vioxx, the medication was prescribed and being utilized in a manner that was intended by defendants. At the time plaintiffs received and consumed Vioxx, it was represented to be safe and free from latent defects.

209.   Defendants knew or should have known of the danger associated with use of Vioxx, as well as the defective nature of Vioxx, but continued to

design, manufacture, sell distribute, market, promote and/or supply Vioxx so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by Vioxx.

210.    As a proximate result of defendants' negligence in designing, manufacturing, selling, distributing, marketing and promoting a defective product, Vioxx, plaintiffs sustained bodily injuries.

211.    By reason of the foregoing, defendants are strictly liable to plaintiffs in the amount and respects set forth in plaintiffs' prayer for relief *infra*.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE ALLEGE:

212.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "211" of the Complaint herein with the same force and effect as if fully set forth herein.

213.    Defendants willfully and intentionally concealed and/or refused to disclose known defects and hazards associated with the use of the pharmaceutical drug Vioxx which they manufactured and/or placed into the stream of commerce.

214.    Plaintiffs were unaware of the significant hazards and defects in Vioxx.

215.    Plaintiffs used Vioxx for the purpose and in the manner normally intended.

216.    As a result of defendants' failure, among other things, to test Vioxx for hazards, or to give adequate warning of its hazards danger, Vioxx was manufac-

tured and marketed in a defective condition, was unreasonably dangerous to users such as plaintiffs, and proximately caused plaintiffs injuries and damages.

217.    Plaintiffs could not have, in the exercise of reasonable care, discovered the defects and hazardous nature of the products manufactured and marketed by the defendants, nor perceived the dangers thereof, nor otherwise averted their injuries and damages.

218.    Defendants' actions in concealing the true nature of Vioxx's cardivascular risks contributed to plaintiffs' inability to preceive the defects and dangerious nature of the drug.

219.    Defendants are strictly liable to the plaintiffs for designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of defendants because of the design defects.

220.    Defendants knew or should have known of the danger associated with the use of Vioxx, as well as the defective nature of Vioxx, but continued to design, manufacture, sell, distribute, market, promote and/or supply Vioxx so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by Vioxx.

221.    By reason of the foregoing, defendants are strictly liable to plaintiffs in the amount and respects set forth in plaintiffs' prayer for relief *infra*.

### AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE ALLEGE:

222.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "221" of the Complaint herein with the same force and effect as if fully set forth herein.

223.   Upon information and belief, at all times relevant, defendants, their agents, servants and employees manufactured and distributed for resale to the general public the pharmaceutical drug Vioxx for oral consumption.  The drug was manufactured and sold by defendants for medicinal purposes, in particular for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

224.   Upon information and belief, in connection with the research, manufacture, production and distribution and sale of the drug Vioxx, the defendants studied its properties and became familiar with them.

225.   Upon information and belief, at all relevant times, defendants knew or should have known that the drug Vioxx had dangerous and harmful effects when used by human beings.

226.   Upon information and belief, defendants, in order to promote the use of the drug and to introduce a greater market for Vioxx, expressly warranted to physicians, and to plaintiffs' prescribing physicians, that patients such as the plaintiffs could use Vioxx for the purpose intended with complete safety.

227.   Upon information and belief, prior to the time plaintiffs purchased and/or accepted samples of Vioxx, defendants, in order to promote the use of the drug and to induce purchase' of Vioxx, expressly warranted to the general

69

public and to plaintiffs, by advertisement, circulars, literature and otherwise, that the consumers, including plaintiffs, could use Vioxx for internal oral consumption for the purpose intended with complete safety.

228.    The plaintiffs relied on defendants' skill, judgment and warranty in purchasing and consuming Vioxx, and plaintiffs' physicians relied on defendants' skill, judgment and warranty in prescribing for plaintiffs.

229.    When plaintiffs were prescribed and/or purchased and/or accepted samples from their physiciansof Vioxx and when defendants sold, gave and distributed Vioxx for resale, defendants' warranties regarding the drug were not true.

230.    The drug Vioxx was not safe and effective as a medication, as defendants had represented.

231.    Defendants' breach of express warranties proximately caused plaintiffs' injuries and damages.

232.    By reason of the foregoing, defendants are strictly liable to plaintiffs in the amount and respects set forth in plaintiffs' prayer for relief *infra*.

### AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS PETER BOIANO, ROBERT H. COENE, MUHAMED KULIJOF, FELIX V. LaPINE ALLEGE:

233.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "232" of the Complaint herein with the same force and effect as if fully set forth herein.

70

234.  At all times relevant to the events described in this complaint, defendants knew or should have known of the hazards associated with the use of the pharmaceutical drug, Vioxx.

235.  Upon information and belief, defendants willfully, recklessly and intentionally concealed and/or misrepresented facts regarding the dangers associated with the use of Vioxx.

236.  Prior to the plaintiffs' ingestion of Vioxx, defendants falsely represented to the public, including plaintiffs and their physicians, through direct promotional campaigns, advertisements, literature to physicians and the literature enclosed in the container in which the drug was sold, that the drug Vioxx and the dosages prescribed were safe and suitable for the purpose intended and could be used with safety to health and well being.

237.  Defendants intentionally falsely stated, advertised or otherwise represented to the plaintiffs, to other users of Vioxx, to the health care professionals and to the public that, as a matter of fact, that it was completely safe to use Vioxx at the recommended dosage levels.

238.  In contradiction to known data, or in reckless indifference to its existence, Merck intentionally misrepresented, advertised or otherwise knowingly and intentionally created the false impression in the plaintiffs, other persons using Vioxx, the health care community including plaintiffs' physicians and among the public that Vioxx was completely safe as long as it was used as intended.

239.   Upon information and belief, defendants knew such statements, representations and advertisements to be false, misleading, inaccurate or incomplete at the time they were made or made them with reckless indifference as to whether they were true or complete at the time they were made.

240.   Upon information and belief, other acts of intentional concealment and suppression of material facts as to the dangerousness of Vioxx were performed by defendants, the details of which lie within knowledge still peculiar to the defendants.

241.   Acting out of pecuniary motives, defendants ignored and intentionally did not act upon and/or ignored or supressed pertinent medical and scientific data issued by the Department of Health and Human Services, corporate medical advisors, and other governmental and private agencies, thereby causing plaintiffs to be exposed to hazards associated with the use of Vioxx.

242.   Upon information and belief, defendants knew that if the suppressed and concealed material facts were known to users and those contemplating use of Vioxx, they would choose not to use Vioxx, thereby lowering production rates and limiting Vioxx's profitable sale.

243.   Upon information and belief, defendants knew that if the supressed and concealed facts were known to the medical community, they would would choose not to prescribe Vioxx thereby lowering production rates and limiting Vioxx's profitable sale.

244.   Upon information and belief, defendants did not have a good faith belief that the concealed scientific and medical information was immaterial or

insignificant to the plaintiffs' understanding of the gravity of harm associated with the use of Vioxx.

245.   Upon information and belief, defendants did not have a good faith belief that the concealed scientific and medical information was erroneous, inaccurate, or otherwise unworthy of dissemination to the general public, the medical community or to the plaintiffs and plaintiffs' physicians.

246.   Defendants' representations were false and fraudulent and were made with the intent to deceive the public, including the plaintiffs and plaintiffs' physicians, to rely on those representations in the purchase and use of the drug Vioxx.

247.   The defendants' representations were false in that:

    a.    the representations failed to warn physicians and potential users of the drug Vioxx of possible injuries, disabilities, harmful adverse reactions and deleterious after and side effects of the drug, and of the necessity of patient selection and of following patients closely;

    b.    the promotional campaigns, advertisements, and literature were incomplete in many respects in that the defendants knew or should have known of the dangerous propensities of the drug;

    c.    the defendants concealed their knowledge of the dangerous propensities of the drug in its advertisements, literature and communications to the medical profession.

248.   Defendants made such representations with the purpose and intent of having potential users and prescribers of the drug rely on the representations. Plaintiffs relied on defendants' representations in purchasing and consuming Vioxx,

and, upon information and belief, plaintiffs' physicians relied on defendants' representations in prescribing Vioxx for plaintiffs.

249.    Plaintiffs and the public were otherwise unaware of the facts intentionally undisclosed and willfully concealed by defendants and could not have become aware the facts through the exercise of reasonable diligence.

250.    Plaintiffs' injuries resulted from the defendants' false and fraudulent representations and the plaintiffs' and their physicians' reliance on such representations.

251.    Plaintiffs and their physicians relied upon defendants' superior knowledge of and familiarity with Vioxx, and such reliance was known by or should have been known by defendants.

252.    General Business Law Section 249(a) states that "[d]eceptive acts or practices in the conduct of any business trade of commerce, or in the furnishing of any service in this State are hereby declared unlawful." General Business Law Section 250 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" within the State of New York.

253.    Defendants and each of them engaged in deceptive and false advertising practices targeting consumers generally, including plaintiffs individually, in the marketing of Vioxx within the State of New York. Plaintiffs justifiably relied upon defendants' deceptive and false advertising resulting in their injuries.

254.   As a direct result of defendants' willful and wanton acts and omissions, gross negligence, conscious indifference and utter disregard for plaintiffs' life, health, safety, and welfare, plaintiffs were caused to sustain other personal injuries, have undergone and in the future will undergo great pain and suffering, were and are unable to attend to their usual occupation and activities, were and in the future will be required to spend money for medical care and have sustained and will sustain other losses, all to their damage in a sum exceeding the jurisdictional limits of all other courts which would otherwise have jurisdiction over this matter.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS
### SYLVIA BOIANO, BEVERLY COENE ALLEGES:

255.   Plaintiffs repeats and realleges each and every allegation contained in paragraphs "1" to "254" of the complaint herein with the same force and effect as if fully set forth herein.

256.   At all times hereinafter mentioned, plaintiffs SYLVIA BOIANO, BEVERLY COENE, was the spouse's of plaintiffs PETER BOIANO, ROBERT H. COENE, and was entitled to spousal services, society, companionship and consortium.

257.   As a result of the aforesaid incidents, plaintiffs SYLVIA BOIANO, BEVERLY COENE, was deprived of the services, society, companionship and consortium of his spouse, plaintiffs PETER BOIANO, ROBERT H. COENE, and continues to be, all to his damage in an amount exceeding the jurisdictional limits of all other courts which would otherwise have jurisdiction over this matter.

**AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST
DEFENDANTS NAMED HEREIN, PLAINTIFFS PETER BOIANO, ROBERT H.
COENE, MUHAMED KULIJOF, FELIX V. LaPINE ALLEGE:**

258.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "257" of the Complaint herein with the same force and effect as if fully set forth herein.

259.    Defendants' conduct as set forth above, including but not limited to knowingly and persistently misrepresenting, promoting, marketing and distributing an unreasonably dangerous and defective pharmaceutical product to regulators, pharmacists, health care providers and consumers including plaintiffs herein without adequate warning and with knowledge of damages posed, constitutes ill will, reckless indifference to the interests of patients and consumers, and merits an award of punitive damages to plaintiffs.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs demand judgment against defendants as follows:

a.    On the First Cause of Action in an amount to be proven at trial including compensatory and punitive damages;

a.    On the Second Cause of Action in an amount to be proven at trial including compensatory and punitive damages;

b.    On the Third Cause of Action in an amount to be proven at trial including compensatory and punitive damages;

c.    On the Fourth Cause of Action in an amount to be proven at trial including compensatory and punitive damages;

d.    On the Fifth Cause of Action in an amount in to be proven at trial including compensatory and punitive damages;

e.    On the Sixth Cause of Action in an amount to be proven at trial including compensatory and punitive damages;

f.     On the Seventh Cause of Action in an amount to be proven at trial including compensatory and punitive damages;

g.     On the Eighth Cause of Action in an amount of punitive damages to be proven at trial; and

h.     The attorney's fees, costs and disbursements of this action and legal interest on all damages from date of demand until paid, and such other and further relief as the Court deems just, equitable and proper.

## JURY TRIAL DEMAND

Plaintiffs respectfully demand trial by jury on all issues presented.

DATED:     Buffalo, New York
           October 20, 2005

                    Respectfully submitted,

                    **THE BARNES FIRM, P.C.**

By:     _____
        Brian A. Goldstein, Esq.
        Attorneys for Plaintiffs
        17 Court Street, 7th Floor
        Buffalo, New York 14202-3290
        (716) 854-2020